THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRENDA KRATOVIL, Defendant-Appellant.

Second District No. 2—03—0795

Opinion filed August 25, 2004.

David M. Stepanich, of Vernon Hills, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Barbara A. Preiner, of Deitsch & Preiner, of Wheaton, for the People.

JUSTICE GILLERAN JOHNSON delivered the opinion of the court:

Following a stipulated bench trial, the defendant, Brenda Kratovil, was found guilty of unlawful possession of Cannabis sativa plants (720 ILCS 550/8(c) (West 2002)), a Class 3 felony, and sentenced to 12 months' conditional discharge and 30 hours of community service. On appeal, the defendant argues that (1) the trial court erred in denying her pretrial motion to suppress evidence and quash arrest; (2) the trial court erred in denying a jury instruction regarding the defense of necessity as codified in section 7—13 of the Criminal Code of 1961 (the Criminal Code) (720 ILCS 5/7—13 (West 2002)); and (3) she is entitled to a defense of medical necessity. We affirm.

## I. BACKGROUND

On November 28, 2001, the defendant was charged by indictment

with a Class 3 felony of unlawful possession of Cannabis sativa plants (720 ILCS 550/8(c) (West 2002)), in connection with an incident in which she was found in possession of 31 marijuana or cannabis plants and drug paraphernalia. The indictment alleged that the defendant knowingly and unlawfully possessed more than 20 but less than 50 Cannabis sativa plants.

On January 17, 2002, the defendant filed a motion to suppress the evidence and quash the arrest that resulted from a search by the police of the defendant's home. On March 8, 2002, the trial court conducted a hearing on the motion to suppress. The defendant, whose vision is impaired, testified that on the afternoon of September 4, 2000, she heard a knock at her front door. She walked to the front door and opened the screen door. Officer John Willer of the Lake County sheriff's police identified himself and stepped inside. The defendant testified that she did not give Officer Willer verbal permission to enter her residence. However, on cross-examination, she admitted that she had voluntarily opened the front screen door and walked backwards away from the door. Once inside, Officer Willer informed the defendant about the marijuana that he observed growing in her backyard.

The defendant testified that at this point, she presented her National Organization for the Reform of Marijuana Laws (NORML) card to Officer Willer. The NORML card informs cardholders of their constitutional rights. Specifically, the card states:

"The U.S. Constitution prohibits the government from interfering with your right to remain silent, to consult with an attorney, and to be free from unreasonable searches and seizures by law enforcement. However, it is up to you to assert these rights. This NORML Foundation Freedom Card will help you do so effectively."

The NORML card also instructs the cardholder to refuse to consent to any searches and to present the card to any law enforcement officers as a statement of the constitutional rights the cardholder wishes to invoke. The defendant knew about the content of the card. She testified that when she gave the card to Officer Willer, he dismissed it.

The defendant testified that once inside, Officer Willer asked her for consent to search her residence. Officer Willer told her that if she did not consent to a search, he would leave two officers in her residence while he obtained a warrant. After obtaining a warrant, he would come back to her residence with a drug dog and "tear the house apart." The defendant then consented to a search. Upon completing the search of the defendant's residence, Officer Willer presented the defendant with a consent form and asked her to sign the form. The defendant testified that Officer Willer physically assisted her in locat-

ing the areas to sign. After she signed the form, the police left the defendant's residence without arresting her.

Officer John Willer testified that he was a deputy with the Lake County sheriff's department and was currently assigned to the Metropolitan Enforcement Group (MEG). The MEG is a joint task force for gangs and narcotics. On the morning of September 4, 2000, the Lake County sheriff's department received an anonymous phone call that someone was growing cannabis in the backyard of the defendant's residence at 9905 Oak Forest in Beach Park. In response to the anonymous tip, at around 5:30 p.m. that day, Officer Willer and two other officers of the MEG, Officer Swanson and Officer Peters, drove to the area of the residence.

The officers approached the defendant's neighbor, Scott Loesch, and requested permission to enter his residence, which Loesch granted. Officer Willer went into Loesch's backyard, which bordered the back of the defendant's residence. He looked over a wooden fence into the defendant's backyard and saw what he believed to be several Cannabis sativa plants growing throughout the defendant's backyard. Officer Willer explained that the MEG has provided him with experience and training on identifying Cannabis sativa plants.

Officer Willer then went to the defendant's residence and knocked on the front screen door, which was closed. The inner door of the residence was already open when he knocked. The defendant approached the front door, and Officer Willer identified himself as a member of the MEG. Officer Willer informed the defendant about what he had observed from Loesch's backyard and asked if he could enter her residence to discuss the situation.

The defendant gave Officer Willer permission to enter her house. He and the two other officers entered the defendant's residence. Once inside the defendant's residence, Officer Willer again told the defendant what he had observed. The defendant informed Officer Willer that she suffered from severe glaucoma and that cannabis helped to relieve the pain in her eyes. Officer Willer asked the defendant for her consent to search the residence for any other cannabis plants. The defendant initially hesitated and did not consent to the search of her residence. She asked Officer Willer what would happen if she did not consent. Officer Willer informed the defendant that he would leave an officer at the residence while he went to a judge who would possibly grant a search warrant for the residence. The defendant then consented to a search of the residence.

Officer Willer and the defendant then went into the kitchen of the defendant's residence. There, Officer Willer presented the defendant with a consent form for her to sign to acknowledge that she had given

the police her consent to search her residence. The consent form was boilerplate, so Officer Willer added an addendum to cover the shed in the defendant's backyard. He asked her to confirm the handwritten addendum and she initialed the added portion. The defendant placed the form close to her eyes but she initialed and signed the form without Officer Willer's assistance. After obtaining her signature, the officers proceeded to search her residence for additional Cannabis sativa plants.

While Officers Swanson and Peters were searching the defendant's residence, Officer Willer and the defendant were in the kitchen. Officer Willer testified that he asked the defendant for identification so that he could fill out some paperwork. The defendant then handed Officer Willer her state identification card along with her NORML card. The defendant did not say anything with regard to the NORML card when she handed it to him. The defendant did not, at any time, verbally assert any of her rights that were written on the NORML card. Officer Willer believed that the NORML card was merely something that had inadvertently become stuck to the defendant's identification card while in her purse and that she had accidentally handed it to him. Because he was focused on the paperwork, Officer Willer did not read the NORML card until after the police had completed the search.

A complete search of the defendant's residence revealed several Cannabis sativa plants on the second floor of the defendant's residence, in addition to the plants in her backyard. The officers also found drug paraphernalia in the defendant's residence. The officers seized the Cannabis sativa plants and the drug paraphernalia. Officer Willer informed the defendant that she would not be arrested at this time. The officers then left the defendant's home.

Following the hearing, the trial court denied the defendant's motion to suppress evidence from the search and to quash her arrest. Specifically, the trial court found:

"Ms. Kratovil voluntarily consented to the search of her residence. And the testimony from everyone is that the officer goes to the defendant's home and knocks on the screen door. The inside door is already open. The officer and Ms. Kratovil both say that the officer identified himself as a—as Deputy Willer and that he was with the Metropolitan Enforcement Group, and explained why he was there and what he saw. The deputy said that he asked if he could come in, and that the defendant said 'yes'; and she stepped back, and he came in.

He again testified that he explained what he saw and asked if he could have a look around. That is, asked if he could search. Ms.

Kratovil indicated that she was not sure, and at this point they took a couple of minutes. During this time frame she asked, 'What would happen if I don't consent?' And in response to her question the deputy explained that he would leave. He would leave someone there. Then he would go back and attempt to get a search warrant, and then come back. I don't find that coercive, but a response to a question asked by the defendant. There was no other conversation. Again, he indicated that there was silence, and then Ms. Kratovil indicated that they could search.

Now, there is a question over this consent to search form. *** And the deputy indicated they walked into the kitchen, as well as Ms. Kratovil said they walked into the kitchen. *** They went into the kitchen and at that time he pulls out a consent to search form and explains to her what this is. And he says yes, he noticed that there was something unusual about Ms. Kratovil, that something was wrong with her eye. And, in fact, when she looked at the consent to search form she held it up very close to her face. She asked 'Where do I sign?' And the officer said, 'By the x.' *** At this time then the search is done both inside and outside the home.

The deputy then talks about getting her identification card, and that—along with that is some other card that he did not look at until after. And I find it hard to believe that after Ms. Kratovil testified that having this card, knowing what was on the card, and knowing now what was going on inside her home that she would not have said to the officer, 'I know my rights. I know you don't have to be here. I know you don't have to search.' Nothing is said when this card is even taken out. And, so, in looking at all of the facts as presented by all of the witnesses, your motion is denied."

On October 9, 2002, the defendant filed a motion *in limine* to present an affirmative defense of necessity as codified in section 7—13 of the Criminal Code (720 ILCS 5/7—13 (West 2002)). The motion also requested that she be allowed to assert an affirmative defense of medical necessity. On December 4, 2002, the trial court denied the defendant's motion. On January 16, 2003, the defense filed a motion to reconsider. The trial court thereafter agreed to hear an offer of proof.

On June 4, 2003, the trial court heard the testimony of Dr. Michael Savitt, a glaucoma specialist and the defendant's treating doctor. At the time of the hearing, Dr. Savitt had been the defendant's doctor for approximately six months. Dr. Savitt testified to the severity of the defendant's ocular disease and to her treatment history. He testified to the treatment options that were available to the defendant, such as topical eyedrops, oral medication, and surgery. Specifically, Dr. Savitt testified that he believed that laser surgery would be the best option

for the defendant. Laser surgery would likely alleviate the defendant's pain over a prolonged period by reducing intraocular pressure and slowing the degenerative effect of the defendant's glaucoma.

Dr. Savitt also testified to the effect of marijuana on a patient suffering from glaucoma. According to Dr. Savitt, the current medical knowledge of the effect of marijuana use on glaucoma patients is scarce. Some medical studies conducted in the 1970s and 1980s indicated that the use of marijuana could relieve pain by marginally reducing intraocular pressure. Dr. Savitt testified that the pain-relieving effect of marijuana is only temporary. Dr. Savitt opined that medicated eyedrops, such as the type the defendant was using, decreased intraocular pressure at a higher rate than the use of cannabis. On cross-examination, Dr. Savitt acknowledged that there was no scientific basis to confirm that marijuana use reduced the defendant's intraocular pressure.

The defendant testified about the medical treatments she had received to treat her glaucoma. Throughout her life, the defendant had undergone approximately 40 surgeries on her left eye. At the time of her arrest, the defendant was using three different types of topical medication to alleviate the pain associated with her glaucoma. Following the hearing, the trial court denied the motion to reconsider.

On June 23, 2003, the defendant signed a waiver of jury trial, and the trial court conducted a stipulated bench trial. Following the trial, the trial court found the defendant guilty of unlawful possession of Cannabis sativa plants. The trial court sentenced the defendant to 12 months' conditional discharge and 30 hours of community service. The defendant filed a timely appeal.

## II. DISCUSSION

### A. Motion to Suppress

We first turn to the defendant's argument that the trial court erred in denying her motion to suppress the evidence from the search and to quash her arrest. The defendant argues that the search of her residence was unlawful because the police did not have a search warrant and did not have valid consent to search. She argues that the police obtained her consent through coercion, and therefore, any fruit of the search must be suppressed.

■ Before addressing the merits of the defendant's argument, we must first establish the proper standard of review on a ruling on a motion to suppress. A circuit court's ruling on a motion to suppress presents mixed questions of both law and fact. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). Thus, our standard of review is twofold. First, we will uphold the trial court's findings of historical fact, unless such

findings are against the manifest weight of the evidence. *Pitman*, 211 Ill. 2d at 512. The trial court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony. *Pitman*, 211 Ill. 2d at 512. However, a reviewing court remains free to undertake its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted. *Pitman*, 211 Ill. 2d at 512. Accordingly, we review *de novo* the ultimate question of whether the evidence should be suppressed. *Pitman*, 211 Ill. 2d at 512.

■ Both the United States and Illinois Constitutions protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Reasonableness in this context generally requires a warrant supported by probable cause. *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 585, 88 S. Ct. 507, 514 (1967). Absent probable cause or a warrant based thereon, a search is violative of the fourth amendment. *Dunaway v. New York*, 442 U.S. 200, 216, 60 L. Ed. 2d 824, 838, 99 S. Ct. 2248, 2258 (1979). A search of a home conducted pursuant to a defendant's voluntary consent is one of the specifically established exceptions to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 36 L. Ed. 2d 854, 858, 93 S. Ct. 2041, 2043-44 (1973); *People v. Koniecki*, 135 Ill. App. 3d 394, 402 (1985). Consent is a waiver of the constitutional privilege against unreasonable searches and seizures. *People v. Harris*, 34 Ill. 2d 282, 285 (1966).

The test for consensual searches is whether the consent was given voluntarily. *People v. DeMorrow*, 59 Ill. 2d 352, 361 (1974). Consent must be given absent any coercion, express or implied. *People v. Graf*, 265 Ill. App. 3d 746, 751 (1994). Consent is not voluntary where it is the result of official coercion, intimidation, or deception. *People v. Cardenas*, 237 Ill. App. 3d 584, 588 (1992). The voluntariness of consent depends on the totality of the circumstances. *Graf*, 265 Ill. App. 3d at 750. It is the State's burden to demonstrate that consent was voluntarily given. *People v. Smith*, 124 Ill. App. 3d 914, 919 (1984).

■ In this case, we believe that the trial court properly determined that under the totality of the circumstances, the defendant voluntarily consented to a search of her home. In making its determination, the trial court relied heavily on the testimony of Officer Willer. Officer Willer testified that he knocked on the defendant's door. When the defendant came to answer the door, he identified himself as a police officer with the MEG. Officer Willer told the defendant why he was there and what he had observed in her backyard. Officer Willer asked if he could come in and the defendant replied that he could. Once

inside, Officer Willer again informed the defendant of what he observed and requested the defendant's consent to search. The defendant hesitated and asked what would happen if she did not consent. Officer Willer explained that he would leave an officer there while he went to a judge to seek a search warrant. The defendant then gave Officer Willer permission to search. Officer Willer's testimony indicates that the defendant voluntarily gave consent for the search of her residence.

We note that the defendant's version of the events was slightly different from that of Officer Willer in that she testified that Officer Willer let himself in. She also testified that she immediately gave Officer Willer her NORML card, which he dismissed as immaterial. She also testified that Officer Willer told her that he would get a search warrant and bring in drug dogs. The defendant further alleged that Officer Willer got her to sign a consent form after the search was completed. However, the credibility of the conflicting testimony between the defendant and Officer Willer is best determined by the trial judge, whose findings will not be overturned unless manifestly erroneous or clearly unreasonable. See *People v. Lozano*, 316 Ill. App. 3d 505, 511 (2000).

The defendant argues that Officer Willer's statement that he would seek a search warrant and leave an officer in her residence in the meantime amounted to coercion. She argues that his statement was misleading. We disagree.

It is important to note that Officer Willer informed the defendant only that he would seek a search warrant, not that he could definitively obtain one. If a police officer has actual grounds to carry out a course of conduct, communicating his intent amounts to no more than informing a defendant of his legal status and does not vitiate consent. *People v. Price*, 195 Ill. App. 3d 701, 708 (1990). While an assertion by the police that they could definitively obtain a warrant is *per se* coercive (*People v. Flagg*, 217 Ill. App. 3d 655, 659 (1991)), it is not coercive for the police to inform an inquiring defendant that they could seek and possibly obtain a warrant (*People v. Magby*, 37 Ill. 2d 197, 201-02 (1992)). See also *People v. Guenther*, 225 Ill. App. 3d 574, 580 (1992) (defendant voluntarily consented to search of his apartment even though officer threatened to bring a drug-sniffing dog into apartment); *cf. People v. Casazza*, 144 Ill. 2d 414, 424 (1991) (police vitiated consent where they illegally represented that they had authority to seize defendant's yacht and remove occupants).

We note that in *People v. Paull*, 176 Ill. App. 3d 960 (1988), the Illinois Appellate Court, First District, was confronted with a situation similar to the one here. In that case, the defendant's cotenant

consented to a search of the premises and signed the consent form only after police officers told her that if she did not consent, they would seek a search warrant. The court upheld the search, determining that mere statements by police that they would seek a warrant if the defendant did not permit the search did not invalidate the consent. *Paull*, 176 Ill. App. 3d at 961. Several other courts have held similarly. See *People v. Holliday*, 115 Ill. App. 3d 141, 144 (1983); *People v. Griffin*, 53 Ill. App. 3d 294, 297 (1977).

Moreover, Officer Willer's statement that he would leave an officer at the defendant's residence while he sought the warrant also did not amount to coercion. We believe that leaving an officer behind to secure the backyard and prevent the destruction of the marijuana plants while a warrant was being sought was a proper option for Officer Willer. The Supreme Court in *Segura v. United States*, 468 U.S. 796, 810, 82 L. Ed. 2d 599, 612, 104 S. Ct. 3380, 3388 (1984), ruled that it is not unlawful for the police to leave an officer to secure premises under exigent circumstances. More specifically, the *Segura* Court held that securing a dwelling to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure. *Segura*, 468 U.S. at 810, 82 L. Ed. 2d at 612, 104 S. Ct. at 3388.

The defendant further argues that even if she did at one point voluntarily consent, she revoked it when she presented Officer Willer with her NORML card. However, Officer Willer's testimony, which was accepted by the trial court, indicated that the defendant handed the NORML card to Officer Willer along with her identification card, while Officer Willer was occupied with paperwork. The defendant did not clarify the purpose of the NORML card, verbally assert her rights as expressed on the card, or even ask Officer Willer to read the card. In fact, Officer Willer was not aware of the contents of the card until after the search was completed. These circumstances do not indicate that the defendant revoked her consent.

Finally, the defendant argues that the police were reckless in creating an intimidating and coercive environment for a disabled individual. While we are sympathetic to the physical condition of the defendant, the record simply does not support her contention that police took advantage of her physical disabilities.

In sum, the trial court's finding that the defendant voluntarily consented to the search of her residence was not improper.

## B. Necessity

The defendant's next argument on appeal is that the trial court erred in denying her motion *in limine* to present the affirmative

defense of necessity as codified in section 7—13 of the Criminal Code (720 ILCS 5/7—13 (West 2002)). The defendant contends that she presented sufficient evidence to support the defense of necessity. The defendant argues that the trial court erred in determining that a defense of necessity was unavailable to her as a matter of law and refusing a jury instruction on the affirmative defense.

A motion *in limine* addresses the trial court's inherent power to admit or exclude evidence. *People v. Williams*, 60 Ill. App. 3d 529, 533 (1978). Though a motion *in limine* is generally used to seek to bar or limit evidence, in appropriate circumstances a proponent of evidence may use a motion *in limine* to obtain a pretrial ruling. *People v. Owen*, 299 Ill. App. 3d 818, 822 (1998). When the trial court is faced with a motion *in limine* regarding an affirmative defense, the trial court should proceed with caution so as not to deprive a defendant of a legally viable defense. *People v. Henderson*, 223 Ill. App. 3d 131, 135 (1991). When an affirmative defense is unavailable as a matter of law, the trial court may properly prohibit the introduction of evidence in support of that defense. *Henderson*, 223 Ill. App. 3d at 135. A reviewing court will not reverse a trial court's grant or denial of a motion *in limine* absent a manifest abuse of discretion. *People v. Downey*, 162 Ill. App. 3d 322, 334 (1987).

The affirmative defense of necessity is codified in the State of Illinois. Section 7—13 of the Criminal Code states:

> "Necessity. Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." 720 ILCS 5/7—13 (West 2002).

The defense of necessity is available to a defendant, as a matter of law, if (1) the defendant was without blame in occasioning or developing the situation and (2) the defendant reasonably believed that her conduct was necessary to avoid a public or private injury greater than the injury that might have resulted from literal compliance with the law. *People v. Janik*, 127 Ill. 2d 390, 399 (1989). In order to properly raise the affirmative defense of necessity, the defendant must present "some evidence" in support of the claim. *People v. Unger*, 66 Ill. 2d 333, 338 (1977).

In this case, we believe that the trial court was correct in denying the defendant's motion *in limine* to present an affirmative defense of necessity. It is undisputed that the defendant was without blame in the occasion of her glaucoma. However, we do not believe that the defendant satisfies the second prong of the test, concerning necessity

to avoid a greater private or public injury than would result from compliance with the law.

Necessity involves a choice between two admitted evils where other optional courses of action are unavailable. *Janik*, 127 Ill. 2d at 399. The conduct chosen must promote some higher value than the value of literal compliance with the law. *Janik*, 127 Ill. 2d at 399. Conduct that would otherwise be illegal is justified by necessity only if the conduct was the sole reasonable alternative available to the defendant under the circumstances. *Henderson*, 223 Ill. App. 3d at 136. When other alternatives exist, which if carried out would cause less harm, then the accused is not justified in breaking the law. *People v. Haynes*, 223 Ill. App. 3d 126, 128 (1991).

The defendant here had other reasonable alternatives to marijuana use. One reasonable option available to the defendant was laser surgery. Dr. Michael Savitt, the defendant's own doctor, testified that he suggested that the defendant undergo a laser surgery procedure. According to Dr. Savitt, laser surgery was more likely than not to be successful in treating the defendant's pain. Furthermore, laser surgery was likely to preserve the defendant's current level of vision. Dr. Savitt testified that in his medical opinion, laser surgery was the best long-term option available to the defendant.

Another reasonable option available to the defendant was medicated eyedrops. The defendant testified that at the time of her arrest she was using medicated eyedrops that decreased intraocular pressure and alleviated her pain. Dr. Savitt testified that the medicated eyedrops the defendant was using decreased intraocular pressure at a higher rate than the use of cannabis. He also testified on cross-examination that there is no scientific proof that the use of cannabis reduces the defendant's intraocular pressure.

In summary, because the defendant had reasonable alternatives other than marijuana to treat her condition, the defense of necessity was unavailable to her as a matter of law. As such, the trial court properly denied her motion *in limine* to present the affirmative defense of necessity.

The defendant contends that the trial court's denial of her motion *in limine* deprived her of her sixth amendment right to a jury trial (U.S. Const., amend. VI) and her fourteenth amendment right to due process (U.S. Const., amend. XIV). She argues that because the trial court did not allow her to present the affirmative defense of necessity, she was forced to forgo a jury trial. We disagree.

The defendant was not deprived of a jury trial. Although the trial court's ruling may have had a bearing on the defendant's decision to seek a bench trial, the ruling did not directly deprive her of her

constitutional right. The defendant still had the option of a trial by jury and voluntarily waived that right orally and in writing.

The defendant also was not deprived of due process. Specifically, the defendant asserts that she had a due process right to instruct a jury on necessity. A defendant is entitled to an instruction " 'as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.' " *People v. Berquist*, 239 Ill. App. 3d 906, 915 (1993), quoting *Mathews v. United States*, 485 U.S. 58, 63, 99 L. Ed. 2d 54, 61, 108 S. Ct. 883, 887 (1988). Even the slightest evidence introduced in support of the defendant's affirmative defense warrants an instruction. *People v. Everette*, 141 Ill. 2d 147, 156 (1990). However, an instruction is not warranted if the evidence before the trial court is so clear and convincing that the court finds the affirmative defense unavailable as a matter of law. *Berquist*, 239 Ill. App. 3d at 915; *People v. Krizka*, 92 Ill. App. 3d 288, 291 (1980). Having previously determined that the defense of necessity was not available to the defendant as a matter of law, the trial court did not err in denying a jury instruction on necessity.

## C. Medical Necessity

■ The defendant's final contention on appeal is that the trial court should have allowed her a defense of medical necessity. The defendant points to the policies of other states, such as California and Florida, that recognize at common law a defense of medical necessity for the possession of cannabis. See, *e.g., People v. Trippet*, 56 Cal. App. 4th 1532, 66 Cal. Rptr. 2d 559 (1997); *Sowell v. State*, 738 So. 2d 333 (Fla. App. 1998); *State v. Hastings*, 118 Idaho 854, 801 P.2d 563 (1990). She asserts that a person in her situation in these states would have the defense of medical necessity available. We review the defense of medical necessity as a matter of first impression in Illinois.

The defendant was prosecuted for possession of marijuana under the Illinois Cannabis Control Act (Cannabis Control Act) (720 ILCS 550/1 *et seq.* (West 2002)). Section 1 of the Cannabis Control Act states:

"The General Assembly recognizes that (1) the current state of scientific and medical knowledge concerning the effects of cannabis makes it necessary to acknowledge the physical, psychological and sociological damage which is incumbent upon its use; *** and (3) previous legislation enacted to control or forbid the use of cannabis has often unnecessarily and unrealistically drawn a large segment of our population within the criminal justice system without succeeding in deterring the expansion of cannabis use. It is, therefore, the intent of the General Assembly, in the interest of the health and welfare of the citizens of Illinois, to establish a reasonable penalty system which is responsive to the current state of knowledge concerning cannabis ***." 720 ILCS 550/1 (West 2002).

A review of this section reveals that the state legislature enacted the Cannabis Control Act with the current state of medical knowledge of the effect of cannabis use in mind.

As further evidence of this, section 11 of the Cannabis Control Act allows for the possession, production, manufacture, and delivery of cannabis by individuals who are engaged in medical research. Section 11 states that the Department of Human Services may:

> "authorize the possession, production, manufacture and delivery of substances containing cannabis by persons engaged in research and when such authorization is requested by a physician licensed to practice medicine in all its branches, such authorization shall issue without unnecessary delay where the Department finds that such physician licensed to practice medicine in all its branches has certified that such possession, production, manufacture or delivery of such substance is necessary for the treatment of glaucoma *** or such other procedure certified to be medically necessary; such authorization shall be upon such terms and conditions as may be consistent with the public health and safety. To the extent of the applicable authorization, persons are exempt from prosecution in this State for possession, production, manufacture or delivery of cannabis." 720 ILCS 550/11 (West 2002).

Having reviewed the statutory language of the Cannabis Control Act, we find no merit to the defendant's contention that she was entitled to a defense of medical necessity. In Illinois, our criminal statutes define all criminal offenses and any affirmative defenses, and prescribe the punishment to individuals who commit offenses. The existence of an affirmative defense such as medical necessity is clearly a matter for the legislature. Under the doctrine of separation of powers, courts cannot legislate, overwrite, or extend legislation. *People v. Breen*, 62 Ill. 2d 323, 327 (1976); *People v. Moore*, 15 Ill. App. 3d 691, 693 (1973). In Illinois, the legislature has chosen not to enact a defense of medical necessity. Accordingly, a defense of medical necessity for possession of cannabis remains unavailable to the defendant and other criminal defendants in Illinois.

In so ruling, we note that our state legislature clearly considered the possibility of medical reasons for cannabis possession when it enacted the Cannabis Control Act. As noted above, section 11 of the Cannabis Control Act allows for the possession, production, manufacture, and delivery of cannabis by persons engaged in medical research. 720 ILCS 550/11 (West 2002). In order for a patient to fall under this narrow exception and lawfully possess cannabis for medical reasons, a licensed physician engaged in medical research must consult the Department of Human Services and certify that his or her patient

must possess cannabis for medical purposes. 720 ILCS 550/11 (West 2002). Certification by a physician engaged in medical research and the authorization of the Department of Human Services are indispensable conditions for the lawful possession of cannabis for medical research.

The defendant here did not fall under the narrow exception for cannabis possession by a medical research patient as provided for in section 11 of the Cannabis Control Act. The defendant's physician was not engaged in medical research and he did not obtain authorization from the Department of Human Services for the defendant to possess cannabis. Indeed, the defendant's physician did not even endorse or recommend that the defendant use cannabis to alleviate her pain. Accordingly, the defendant was not exempt from prosecution for her possession of cannabis.

Similar to Illinois, other states recognize the exception of medical necessity only according to the narrow exceptions as defined by the legislatures in the respective statutes. Even in those states that statutorily recognize an affirmative defense of medical necessity for the possession of cannabis, the subject must adhere to the stringent statutory provisions. We note that these states uniformly require a physician's approval. See, *e.g.*, *State v. Williams*, 93 Wash. App. 340, 349, 968 P.2d 26, 30-31 (1998) (holding that the defendant is not entitled to jury instruction of medical necessity because defendant could not meet statutory definition); *State v. Hanson*, 468 N.W.2d 77, 79 (Minn. App. 1991) (holding that medical necessity was unavailable except for the single exception provided in statutory language that exempts defendants who are receiving the drug under the strict controls of an approved medical research program); *State v. Tate*, 102 N.J. 64, 73, 505 A.2d 941, 945 (1986) (holding that medical necessity did not apply where the defendant possessed cannabis in contravention of statutory law and not within the specific statutory provision); see also *State v. Poling*, 207 W. Va. 299, 306, 531 S.E.2d 678, 685 (2000) (medical necessity for cannabis possession unavailable where the state legislature made no statutory provision for the defense).

Last, the defendant argues that her conduct should be excused because, as to date, the Department of Human Services has not established a cannabis research program. We find this argument unpersuasive. While the Department of Human Services has not authorized a cannabis research study, it also has not absolutely barred such a program. The legislature has granted the Department of Human Services discretion in granting certification to possess marijuana according to the requirements of the Cannabis Control Act. It does not follow that the defendant has exhausted all possible legal avenues

merely because the Department of Human Services has not chosen to exercise that discretion yet. The defendant has no justification in circumventing the law by self-medicating with an illegal substance. Rather, the defendant must instead direct her arguments for a cannabis research program at medical professionals, who can then petition the Department of Human Services, or the General Assembly, who can modify the statute.

In conclusion, a defense of medical necessity is unavailable to the defendant because the legislature has not enacted such a defense. Furthermore, the defendant did not meet the statutory requirements as defined in section 11 of the Cannabis Control Act in order to lawfully possess cannabis as a medical research patient.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

GROMETER and KAPALA, JJ., concur.