2020 IL App (2d) 180438-U
No. 2-18-0438
Order filed October 29, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CM-3812 |
| MARK K. SULLIVAN, | ) ) ) | Honorable Kathryn D. Karayannis, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Bridges and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*: At defendant's trial for violation of a bail bond for entering his house within 72 hours of his arrest, the trial court did not err in declining to instruct the jury on the defense of necessity; defendant claimed that, when he broke into his home several hours after his release on bond, he did so because of an urgent need to retrieve medication he was prescribed for his neurological condition; however, defendant did not present enough evidence that he was not to blame for his desperate condition or that he had no reasonable alternative for obtaining the medication.

¶ 2   Defendant, Mark K. Sullivan, appeals from his conviction, following a jury trial, of

violation of bail bond (720 ILCS 5/32-10(b) (West 2016)), arguing that the trial court erred in

refusing to instruct the jury on the affirmative defense of necessity. He asks that we reverse and remand for a new trial. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On November 17, 2016, defendant lived at 1752 Marilyn Drive in Montgomery, along with his wife, Lillie; his daughter, Maya; and his son, Jordan. At about 10 or 10:30 p.m., defendant was arrested at his residence for the offense of disorderly conduct (victim as family member) and brought to the Montgomery police station. Shortly after midnight on November 18, 2016, defendant was released on bail, with a condition of bail prohibiting him from returning to the residence for 72 hours. Defendant returned to the residence less than 11 hours later. He was arrested and charged with violation of domestic violence bail bond (*id.*)

¶ 5    Prior to trial, the State filed a motion *in limine* seeking to bar defendant from raising an affirmative defense of necessity. The State argued that, because defendant had multiple alternatives to violating his bail bond, he could not raise a necessity defense. The trial court found that, without having heard evidence, any ruling on the State's motion would be premature.

¶ 6    At trial, 17-year-old Maya testified that, during the late morning hours of November 18, 2016, she was at home watching TV when she heard yelling and banging on the front door. She recognized defendant's voice. She was "absolutely terrified." Maya called her mother because she knew that defendant was not supposed to be at the house, and her mother called the police. Maya went to her upstairs bedroom. She heard defendant enter the garage, where there was a second door that was kept locked and bolted. She heard the second door being "broken down." Maya exited her room and saw defendant standing at the top of the stairs. She testified that defendant was "yelling," and she described him as "distressed" and "very angry." When the police arrived, Maya let them in.

¶ 7     Village of Montgomery police officer Elizabeth Palko testified that, at about 10:58 a.m. on November 18, 2016, she responded to a "check-the-welfare 911 call" at defendant's residence. When she arrived, the garage door was closed, but she could hear banging from inside. Maya opened the door and Palko went inside. Palko was aware that defendant had been arrested the night before on a disorderly conduct charge and that the victim in that case was defendant's wife, Lillie. She was also aware that one of the conditions of defendant's bail was that he was not to return to the residence. Palko saw damage along the door frame to the garage. She saw a crowbar and defendant's vehicle in the garage. Defendant was arrested at that time. She heard defendant state that "he thought he could get in and out quicker without anyone knowing." Palko identified People's exhibit No. 6 as the bail bond issued to defendant on November 17, 2016. She testified that defendant was released on a "personal recognizance bond," with the condition that he "must refrain from contacting and/or communicating with the alleged victim and refrain from entering or remaining at the alleged victim's residence for a minimum of 72 hours following [his] release." She also testified that it was not common practice for police to accompany someone to a residence that they are not allowed to enter to get personal belongings. To her knowledge, defendant never requested an escort to the residence.

¶ 8     Village of Montgomery police officer Cody Klingberg arrived at defendant's residence at the same time as Palko. Klingberg encountered defendant upstairs. Defendant told Klingberg that "no one was supposed to be home, so he came home to get some belongings and get out without anybody knowing." Defendant did not say anything about needing medication and Klingberg did not see defendant with any medication. On cross-examination, Klingberg testified that, when he first saw defendant, defendant was in his bedroom gathering his belongings and changing clothes.

He saw defendant wiping "fecal matter" off of his "genital area." He observed "[w]hat appeared to be urine" on defendant's clothing from his waist to his knees.

¶ 9    For the defense, defendant testified that he was 54 years old and had been disabled since 2010. At about 10 or 10:30 p.m. on the evening of November 17, 2016, he was arrested at his home for disorderly conduct. He was taken to the Montgomery Police Station, where he remained for "[t]wo hours at tops." He was released after midnight on November 18, 2016, on a personal recognizance bond, with a condition being that he could not return to his residence for 72 hours. He was wearing jeans, a short-sleeved shirt, and shoes. He had $4 in his pocket. He did not have any credit cards. He had "a car that they had brought there" for him, his glasses, and his cane. He was given his car keys when he left the police station.

¶ 10    Defendant testified further that, upon his release, he went to the Walmart parking lot, which was located nearby, and slept in his car. He awoke at about 10 a.m., "[d]istressed [and] in disarray." He testified: "I could no longer control my bowels or my bladder, so feces and urine were on my car seat, my jeans, underwear, everything." He was experiencing "[p]ain in his shoulders and knees," "[d]eep depression and hurting." When asked what he did next, he testified: "Well, I needed my meds. I needed to eat. I needed some clothes. I needed to get cleaned up. And my house was right down the street, but I was—you know, I needed to get stuff in me and off of me." Defendant testified that his parents and siblings lived out-of-state and that he did not have any friends in the area. Defendant went to his residence. He entered the garage and used his key to open the inside door. He testified that "they slid that top bolt on the inside," so he could not get in without using a "pry bar." Once inside the house, defendant went upstairs to his room. He explained: "I was covered in feces and urine. I needed to grab my pill tray, clothes, get cleaned up, get a jacket, long-sleeve shirt, and then downstairs to get some food." Defendant encountered

Maya and shortly thereafter the police arrived. One of the officers helped defendant get his clothes and permitted him to clean himself off. He was then taken to the police station.

¶ 11    Defendant testified that he had a condition called "[p]rogressive supranuclear palsy," and that Dr. Teresa Grant was his primary care doctor. He described his condition as a "combination of—kind of like Alzheimer's, Parkinson's, and multiple sclerosis." He stated: "It affects your vision, gait, and balance. I wear [a] brace because my left foot drops. It affects any transmissions from your brain to different parts of your body, like my bladder, my bowels." He testified that "[t]hey treat the symptoms as they come, but it progressively gets worse." When asked if he had any other diagnoses as a result of the supranuclear palsy, he stated: "High blood pressure, diabetes, neurogenic bladder, bowel issues, the gait, the balance, what it's doing to my vision. I can't drive anymore." When asked if he had any cognitive issues, he responded: "Memory is probably the biggest one and what it does to you, your mood, your thinking."

¶ 12    Defendant testified that he took 34 pills a day, consisting of 15 or 16 different types. On November 18, 2016, the four most critical medications were: fentanyl, baclofen, Oxycontin, and Cymbalta. He testified that he took fentanyl, a "Schedule I narcotic," for "[s]evere chronic pain." It was applied by way of a patch, which he would wear for three days at a time. The patch was scheduled to be changed on November 18, 2016. He took baclofen three times a day for muscle spasms. He took Cymbalta for anxiety and depression; two pills in the morning and one pill at night. His medications were kept in a "pill tray," which was "set up at 8:00 a.m., noon, 5:00 p.m., and 9:00 p.m." At 8 a.m. on November 18, 2016, he was scheduled for a dose of Cymbalta and baclofen. He testified: "[B]ut I even missed the one the night before because of the arrest. I hadn't taken my nighttime pills by the time they got there because of what was going on in the house." When he awoke at about 10 to 11 a.m. on the morning of November 18, 216, he was feeling

withdrawal symptoms from having missed his medication. He testified: "My shoulders, my knees, every—you know, trying to get comfortable, and you just can't get comfortable."

¶ 13 On cross-examination, defendant was shown a copy of the bail bond that he signed upon his release from custody and he agreed that the signature "appears to be" his. He agreed that when he was arrested, he knew that he had medications that he needed to take and that he would experience side effects if he did not take them. He testified that he was released from custody after midnight and that Lillie brought the car to the police station, leaving the keys for him. Defendant did not have his cellphone or his wallet. He did not ask anyone at the police station if he could make any phone calls before he left. When he arrived at Walmart he did not go in to use the restroom. He testified: "I didn't have catheters with me. I didn't have Depends with me." He did not go in the store to call his wife, because "she would not have answered." When he asked whether he told the police, before leaving the police station, that there were items he needed from home and needed help getting them, he stated: "I was not thinking that clearly. No, I did not ask because I was in disarray." He did not call his doctor about his medications on Friday, because his doctor was not in on Fridays. He stated that the other doctors in her office were not familiar with his case, as it was "a very rare disease." He also testified that he had an aide who worked from 9 a.m. to 3 p.m. on Monday through Friday. He did not call the aide because he did not have her number and because she was off that Friday.

¶ 14 Defendant testified that all of his pills were set up in two pill trays. The medication was presorted for him a week in advance by Lillie and his aide. Defendant testified that Lillie filled his medication trays; he did not have the ability to do so due to dexterity and vision issues. In November 2016, his wife was primarily responsible for setting up his pill tray. He changed his fentanyl patch every Friday, so that he would not be without it over the weekend. He could not

recall when he last changed his patch prior to November 18, 2016. He did not know if he was "in withdrawal[]" when he woke up, but he was in pain. When he arrived at the house, he wanted to "change [his] clothes, get [his] meds, get something to eat, get [his] phone, get [his] wallet, get a jacket." Defendant testified that when the police arrived, he told them that he needed his medication.

¶ 15    On redirect examination, defendant testified that he did not enter Walmart after waking up in his car because he "was covered in feces and urine." He stated that he was "ashamed" and "embarrassed" and that he did not have a catheter with him, which he used to drain his bladder two to three times per day. He also did not have Depends with him. Defendant testified that the bail bond conditions did not permit him to return home with a police escort. When asked why he did not contact the police or go to the police and ask them to take him to his house, he responded: "Well, because the same bunch had just arrested me a few hours earlier, and then I am covered in feces and urine, and I'm sure they would have got a big kick out of that." When asked again why he did not contact the police that morning, he stated: "Because I was embarrassed, ashamed, and in a condition of the clothes I had on, and what I needed they couldn't provide." When asked what they could not provide, he stated: "A bath, clothes, food, and the prescriptions. I mean I can't even get them from Walgreens without first going through [Dr. Grant]." Defendant stated that he was not permitted to get prescriptions from any doctor other than Dr. Grant and that Dr. Grant was off on Fridays. He stated that Dr. Grant worked at Edward Hospital and at a hospital in Sandwich. Defendant was asked why he could not have gone to an urgent care center to get his medication, and the following colloquy occurred:

"A. Well, even the Edward[], yeah, when they looked at my pharma list and see what disease I have and everything else, they immediately don't want to touch me and they want to send me to Edward[] Hospital.

Q. And do you have experience with that in the past, where—

A. Numerous times.

Q. And you have always been directed back to Dr. Grant?

A. And/or to the hospitals.

Q. Where Dr. Grant works?

A. Right.

Q. And is it fair to say that the urgent care wouldn't prescribe you the medication you needed?

A. No."

¶ 16    Dr. Teresa Grant, an expert in internal medicine, testified that she had been treating defendant for eight years. She stated that he had "a neurological disorder, progressive in nature, called progressive supranuclear palsy." It had "features of Parkinson's" such as "rigidity, easy falls, tremor, bradycardia." He also had painful back spasms. It had a "very distinct mental component." It "manifests itself a lot like Alzheimer's disease, like memory impairment, cognitive dysfunction, core executive dysfunction, which means he can't like put a list of ideas together, organize his thoughts."

¶ 17    Dr. Grant testified that defendant took 13 medications, 9 of which were for his diagnosis. He was treated for back spasms, pain, cognitive dysfunction, memory impairment, agitation, and depression. She testified that he was on a fentanyl patch that got changed every three days. It was a controlled substance that required a physical copy of the prescription to be filled. She required

48-hours-notice for a refill. Although she worked in a group of 11 doctors, each doctor always filled their own patients' medications. If defendant needed a prescription, he would have to call her office. Although another doctor could fill defendant's prescription, it was not their normal practice to do so. Dr. Grant testified that, within 24 hours of withdrawal from fentanyl, "you will have your most severe symptom, generally with the G.I. symptoms first, abdominal pain, diarrhea, vomiting." Dr. Grant testified that defendant took Cymbalta twice daily for anxiety, depression, and chronic pain. Symptoms of withdrawal from Cymbalta included "agitation, nausea, headache." Defendant also took baclofen, a muscle relaxer, three times per day. If he stopped taking baclofen, his muscle spasms would return. Symptoms of withdrawal from baclofen included agitation and could also induce seizures if stopped abruptly. Dr. Grant testified that, in November 2017, if defendant "were to miss the dosage," the withdrawal symptoms she described "could have" manifested in defendant. She testified that it could be "potentially" life-threatening for him to be without his medication.

¶ 18    On cross-examination, Dr. Grant testified that the withdrawal symptoms she described could manifest differently in different people. She was not able to state what symptoms defendant was experiencing on November 18, 2016. She agreed that if defendant missed one dose of fentanyl it was not 100% certain that he would exhibit every withdrawal symptom. She testified that defendant did not call her office on November 18, 2016, to request a refill of his prescription.

¶ 19    On redirect examination, Dr. Grant was asked what additional withdrawal or other symptoms could have manifested if defendant missed all 13 of his medications. She testified that he was also on medication for diabetes, which, if missed, would result in hyperglycemia and mental confusion. Defendant was also on blood pressure medication, which, if missed, would result in dizziness, tachycardia, and increased risk of falls.

¶ 20    At the jury instruction conference, the State presented two non-Illinois Pattern Jury Instructions for violation of bail bond. The first instruction—State's instruction No. 13a— provided that the State must prove the following three propositions: (1) that defendant had been admitted to bail for an offense in which the alleged victim was a family or household member; (2) that defendant knew that a condition of his release was to refrain from entering that victim's residence for a minimum of 72 hours following his release; and (3) that defendant knowingly violated that condition by entering the victim's residence. Defendant objected to the instruction. The State advised that it had a second instruction—State's instruction No. 13b—which added a fourth proposition, (4) that defendant did not act out of necessity. The State argued that, if the court were to allow defendant to raise the defense of necessity, it asked for instruction No. 13b to be sent to the jury.

¶ 21    Thereafter, defense counsel argued that the evidence was sufficient to raise an affirmative defense of necessity. Counsel asserted that a necessity defense was warranted if "[d]efendant was without blame in occasioning or developing this situation" and "reasonably believed that such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result [from] his own conduct." Counsel argued that defendant was without blame in occasioning or developing "his medical diagnosis" and that returning home in violation of his bail bond was necessary to avoid the private injury of "serious withdrawal symptoms and complications and side effects should he not have that medication."

¶ 22    The State responded that defendant was not without blame in occasioning or developing the situation, because "those conditions of bail that he violated would not have been in place had it not been for his actions" of being arrested for committing disorderly conduct. In addition, the State argued that defendant failed to exhaust other options before violating his bail bond, such as

asking for help from the police or attempting to call anyone else for help. "He didn't attempt to drive to the hospital that he said he's frequently referred to when he gets kicked out of an immediate care that cannot help him." He did not call his doctor's office.

¶ 23    Thereafter, the trial court denied defendant's request to instruct the jury on the affirmative defense of necessity, ruling as follows:

> "I have considered the case law presented in the case in the court's—excuse me—in the State's motion *in limine*. I have again heard argument from both sides just now in relation to this, and while I don't necessarily agree with the State's analysis of [defendant's level of blame for his situation], I do not find that the necessity defense is warranted in this case.
>
> The case law is clear that the Defendant should have attempted, and at least in the court's opinion, other alternative prior to suggesting that this was a necessity. He had already missed some medication. He could have called the doctor's office. He could have gone to the hospital. He could have called 911. He did none of those things, and therefore I do not believe that he exhausted any alternatives prior to deciding to return home."

The State's instruction No. 13a was given to the jury.

¶ 24    The jury found defendant guilty of violation of bail bond (720 ILCS 5/32-10(b) (West 2016)), and defendant filed a motion for a judgment notwithstanding the verdict or for a new trial. Defendant argued, *inter alia*, that the trial court erred in failing to instruct the jury on the defense of necessity. According to defendant, he presented evidence that he was without blame in occasioning his illness. In addition, whether his conduct was objectively reasonable should have been decided by the jury. The trial court denied the motion, stating that "the evidence was clear

and certainly convincing that there were reasonable, other reasonable alternatives available to the defendant.”

¶ 25    Following a sentencing hearing, the trial court sentenced defendant to three consecutive weekends in jail and 24 months' probation. This timely appeal followed.

¶ 26                                    II. ANALYSIS

¶ 27    Defendant argues that the trial court erred in refusing to instruct the jury on the affirmative defense of necessity. According to defendant, the reasonableness of his conduct in response to the "necessity created by his illness" was a question for the jury. He argues that the trial court, by denying the jury instruction, usurped the role of the jury, leaving the jury no other option but to convict him.

¶ 28    A defendant is entitled to a jury instruction regarding an affirmative defense if there is some evidence, however slight, in the record to support that defense. *People v. Gibson*, 403 Ill. App. 3d 942, 951 (2010). "[W]hen the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify the giving of a jury instruction, the proper standard of review of that decision is abuse of discretion." *People v. McDonald*, 2016 IL 118882, ¶ 42. "[A]n abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *Id.* ¶ 32.

¶ 29    The affirmative defense of necessity is set forth in section 7-13 of the Criminal Code of 2012 (Code) (720 ILCS 5/7-13 (West 2018)) as follows:

"Necessity. Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct."

- 12 -

Thus, the defense is available if there is some evidence that (1) the defendant was without blame in occasioning or developing the situation, and (2) the defendant reasonably believed that his conduct was necessary to avoid a public or private injury greater than the injury that might reasonably resulted from his conduct. *People v. Janik*, 127 Ill. 2d 390, 399 (1989); *People v. Kratovil*, 351 Ill. App. 3d 1023, 1033 (2004). The necessity defense "is viewed as involving the choice between two admitted evils *where other optional courses of action are unavailable* [citations] and the conduct chosen must promote some higher value than the value of literal compliance with the law." (Emphasis added.) *Janik*, 127 Ill. 2d 390 at 399. "Conduct that would otherwise be illegal is justified by necessity only if the conduct was the sole reasonable alternative available to the defendant under the circumstances." *Kratovil*, 351 Ill. App. 3d at 1034. Thus, where there are other reasonable alternatives, the defense of necessity is unavailable as a matter of law. *Id.*; see also *People v. Cord*, 258 Ill. App. 3d 188, 194 (1994) ("The availability of other alternatives precludes a reasonable belief on defendant's part that driving a vehicle while under the influence of alcohol was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct.").

¶ 30    First, we note that defendant invites us to reject the "sole reasonable alternative" requirement, citing *People v. Kucavick*, 367 Ill. App. 3d 176, 180-81 (2006), wherein the Third District held that a jury instruction on a necessity defense is warranted even if other alternatives exist. We decline his invitation. Defendant has not directed us to any other decision that has followed *Kucavick*. Indeed, other courts post-*Kucavick* have continued to follow the "sole reasonable alternative" requirement. See *People v. Boston*, 2016 IL App (1st) 133497, ¶ 39 (necessity defense applies when the "defendant's conduct was the sole option to avoid injury"); *People v. Guja*, 2016 IL App (1st) 140046, ¶ 49 ("because defendant had reasonable alternatives

*** the defense of necessity was therefore unavailable to him as a matter of law"); *People v. Gibson*, 403 Ill App. 3d 942, 952 (2010) ("if other alternatives existed that would have caused less harm, the defendant *** was not entitled to the necessity defense instruction"), *abrogated on other grounds*, *People v. Bailey*, 2014 IL 115459. Accordingly, we continue to follow the weight of authority holding that a necessity defense is not warranted where other reasonable alternatives are available to defendant.

¶ 31    Defendant argues that, even applying the "sole reasonable alternative" requirement, he presented sufficient evidence that none of the alternatives were reasonable under the circumstances and that thus the necessity instruction should have gone to the jury. We disagree. Defendant addresses three alternatives advanced by the State and explains why they were not reasonable. First, he argues that going to the police station and being escorted home was not a reasonable alternative, because the bond conditions precluded him from going home and because he "did not know that calling the police would have been a possibility." Next, he argues that calling his doctor or going to urgent care was not a reasonable alternative, because Dr. Grant was off on Fridays; he argues that it would not have been easy to get another prescription for his controlled medication and that he did not have money to pay for any prescriptions. He also argues that urgent care was unable to prescribe medication and, in any event, he did not have his medication list with him. Last, he argues that going to Walmart to change clothes and call someone was not a reasonable alternative, because he could not enter Walmart covered in feces and urine and because he did not have any money.

¶ 32    However, defendant overlooks the trial court's finding that reasonable alternatives also included calling 911 as well as going to the hospital. The immediacy of the situation here stemmed from defendant's need for his medications. Even if we were to accept defendant's testimony that

he would have been unable to obtain his necessary prescriptions from Dr. Grant's office due to Dr. Grant being out of the office on Friday (although Dr. Grant testified that another doctor could fill defendant's prescriptions) and due to the fact that he had only $4 in his possession, the evidence showed that defendant could have obtained what he needed from the hospital. To be sure, defendant testified that *urgent care* would not prescribe him his medication. However, defendant also testified that, in the past, urgent care had directed him "[n]umerous times" to Dr. Grant "and/or *to the hospitals*" where Dr. Grant worked. (Emphasis added.) Defendant testified that Dr. Grant was affiliated with Edward Hospital and a hospital in Sandwich. Defendant could have either driven himself to the emergency room or called 911 for assistance. Thus, given the other reasonable alternatives available to defendant, we hold that the trial court did not abuse its discretion in refusing to instruction the jury on the affirmative defense of necessity.

¶ 33    We note too that defendant failed to present sufficient evidence as to the first prong of the necessity defense, *i.e.*, evidence that he was "without blame in occasioning or developing the situation" that created the necessity (720 ILCS 5/7-13 (West 2018)). Here, the trial court did not expressly rule on the issue, noting only that it did not "necessarily agree with the State's analysis of the first prong." The State argued below that defendant was not without blame in occasioning or developing the situation, because "those conditions of bail" would not have been in place but for defendant's actions that resulted in his arrest. (On appeal, the State again argues that defendant was not without blame in his arrest but now also adds that defendant was not without blame in his failure to take his medication with him or in failing to tell the police that he needed his medication.) Defendant contends that the State's analysis of blamelessness is incorrect. He asserts that, "[i]f a defendant can be found not blameless simply due to the fact he was previously arrested, then no

defendant could ever raise the necessity defense to an offense of violation of bail bond." Defendant argues that he "was utterly without blame in occasioning or developing his rare disease."

¶ 34    Neither party has framed the relevant "situation" properly. Each party's argument focuses on only one aspect of the "situation"; the State focuses on the arrest and resulting bail bond and defendant focuses on his illness. Although we agree with defendant that he was without blame with respect to his medical condition, the situation did not arise solely by virtue of his illness. Even if we do not place blame on defendant for his arrest and the resulting bail bond conditions, defendant was not without blame in occasioning or developing the situation that he found himself in when he awoke in the Walmart parking lot. Defendant was arrested at about 10 or 10:30 p.m. on November 17, 2016. At that time, he had already missed some doses of various medications. He knew that he would experience side effects if he did not take his medication. Defendant was brought to the police station and, according to his testimony, released within two hours. When defendant signed the bail bond, he was aware that, as a condition of his release, he was not to return home for three days. Nevertheless, upon his release, defendant failed to advise anyone at the police station that he needed his medication, which was located at his residence. Instead, with no cell phone or money, defendant left the police station, drove his car to the Walmart parking lot, parked his car, and fell asleep. Defendant was not without blame in the development of the situation that he found himself in when he awoke.

¶ 35    Accordingly, defendant's failure to submit evidence as to the first prong of the necessity defense provides an additional basis to affirm the trial court's refusal to instruct the jury on the defense. See *People v. Dinelli*, 217 Ill. 2d 387, 403 (2005) (we may affirm the trial court on any basis that is supported by the record).

¶ 36                                III. CONCLUSION

¶ 37    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 38    Affirmed.