No. 2--03--1345

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

THE PEOPLE OF THE STATE      ) Appeal from the Circuit Court

OF ILLINOIS,      ) of Carroll County.

      )

Plaintiff-Appellee,      )

      )

v.      ) No. 03--CF--22

      )

RACHEL L. GREEN,      ) Honorable

      ) Val Gunnarsson,

Defendant-Appellant.      ) Judge, Presiding.

______________________________________________________________________________

JUSTICE McLAREN delivered the opinion of the court:

Defendant, Rachel Green, appeals from the trial court's denial of her motion to suppress evidence.
  
We reverse.

Defendant was charged with one count of possession of 100 grams or more but less than 400 grams of a substance containing methamphetamine, or any salt of an optical isomer of methamphetamine (720 ILCS 570/402(a)(6.5)(B) (West 2002)).  She filed motions to suppress statements and to suppress evidence.  Following a combined hearing on those motions, the trial court granted the motion to suppress statements but denied the motion to suppress evidence.  The trial court then found defendant guilty of an amended charge of possession of 15 or more but less than 100 grams of methamphetamine (720 ILCS 570/402(a)(6.5)(A) (West 2002)), after a stipulated bench trial.  Defendant's motion for a new trial was denied.  This appeal followed.

Defendant contends that the trial court erred in denying her motion to suppress evidence.  In reviewing a ruling on a motion to suppress, this court may reverse the trial court's findings of historical fact only if they are against the manifest weight of the evidence.  
People v. Morquecho
, 347 Ill. App. 3d 382, 386 (2004).  However, we review 
de novo
 the trial court's ultimate conclusion as to the existence of probable cause or reasonable suspicion.  
Morquecho
, 347 Ill. App. 3d at 386.

Police Chief Michael Moon of the Savanna police department was the only witness to testify.  Moon stated that at about 1:20 p.m. on March 17, 2003, his office received a call from the Carroll County sheriff's office relaying an anonymous tip about a white male placing a backpack behind the garage at 618 Poplar in Savanna.  The tipster stated that she had looked inside the backpack "and found a meth lab."  The backpack had been placed by some garbage cans in the alley that ran along the back of the lot.  Chief Moon sent Officer Long to the scene and then headed to 618 Poplar, which was a single-family residence.  As he approached the house, he received a radio call from Long telling him that the backpack was still by the garbage cans.  Moon then saw defendant either standing by a truck that was parked in front of the house or walking back and forth between the two.  He started talking to her through the open window of his car door, asking her what she was doing.  Moon testified that defendant "got very defensive" and "kept getting interrupted by cell phone calls."

Defendant told Moon that she had been dropped off at 618 Poplar and was waiting for a ride.  Moon then got out of his car and walked toward defendant, whom he described as "acting kind of nervous."  Defendant, speaking on her cell phone, said that the police were "harassing" her and that she needed a ride.  At some point, she told Moon that no one was home at the house; she had knocked at the door and no one answered.  Shortly thereafter, Moon heard loud music coming from 618 Poplar.  Moon walked to the front door of the house and moved a backpack that was in front of the door.  Moon described the backpack as heavy and he heard what "sounded like glass jars inside" when he moved it.  He asked defendant whose backpack it was, and she stated that it was hers.  In response to Moon's question about the contents, defendant told him that it contained clothes.  When Moon mentioned the noise that he heard inside the backpack, defendant stated that there were clothes and personal items inside.  Moon asked if he could look inside the backpack, and defendant said "no[,] that she didn't want me looking at her underwear."  Moon knocked at the front door two or three times, but no one answered.  He was unsure if he then picked up the backpack and handed it to defendant or if she picked it up herself, but the pack was then in defendant's possession.

Moon then told defendant, " 'We need to go to the back and find out what's going on here.' "  He did not at that time have any information connecting defendant to the backpack in the alley.  Moon and defendant, who carried her backpack, walked through the yard to the back of the property.  Moon did not touch or restrain defendant, nor did he tell her she was under arrest.  At that point, the occupants of the house came out the backdoor.  Melissa Flickinger told Moon that she did not know how the backpack got in the alley or to whom it belonged.  Flickinger's boyfriend Josh gave a similar statement.  Moon did not ask them about defendant's backpack, which had been at their front door.  (At defendant's preliminary hearing, over which the same trial court presided, Moon testified that Flickinger told him she knew that defendant was outside but that she did not want to let her in because she was taking a shower with her boyfriend.)  Defendant remained "by the alley" with her backpack on the ground next to her during these conversations.  Officer Long and the other backpack were about 30 feet away from defendant.

Moon then spoke to Officer Sisler, who had arrived while Moon was speaking to Flickinger.  Sisler had inspected the backpack in the alley and told Moon that it contained "a large meth lab," which he had dismantled.  Moon again asked defendant if he could look in her backpack, and again she told him no.  Shortly thereafter, defendant told Moon that she wanted to leave.  Moon still had no information to connect defendant to the backpack in the alley.  However, he told her that she could not leave.  Moon told defendant he thought that she had materials involved in a methamphetamine lab inside her backpack and that he "was going to get a search warrant for her bag and a search warrant for the house--Flickinger's house and find out what was inside."  According to Moon, defendant was not free to leave at that point.  By then, three other officers were present.  Defendant "got irate" and told Moon that there was nothing but clothes in the backpack and unzipped the top and pulled out some clothes.  Moon could see the tops of some glass jars in the backpack.  He asked what was in the jars, and defendant pulled out one jar and said there was nothing inside.  Moon could see a little clear liquid in the jar.  Moon looked down into the backpack and saw another jar with an orangish powder in a coffee filter.  Based on his training and experience, Moon thought that this resembled the remnants of a methamphetamine lab.  Defendant denied that the jars belonged to her.  Moon then placed defendant under arrest.  Approximately 30 minutes had passed since Moon had first seen defendant in front of the house, and 20 to 25 minutes had passed since he had told defendant to go to the back of the house.

Prior to looking into defendant's backpack, Moon did not touch or restrain defendant in any way.  He did not suspect that she might be carrying a weapon, and he did not pat her down.  Defendant did not act aggressively toward him.  Several months prior to this incident, Moon had heard from another Savanna police officer that defendant was a possible user of methamphetamine.  There was nothing unusual about a young person (defendant was 17 years old at the time) carrying a backpack or using a cell phone.  The other officers did not draw their guns.

Because this appeal does not involve the motion to quash statements, we need not recite the facts concerning defendant's statements subsequently given to the police.

Reviewing 
de novo
 the trial court's ultimate conclusion, we determine that the trial court erred in denying defendant's motion to suppress evidence.  There simply was no evidence to support either the seizure or the search of defendant.  Generally, a warrant supported by probable cause is required for a search or seizure to be reasonable under the fourth amendment to the United States Constitution.  
People v. Sorenson
, 196 Ill. 2d 425, 432 (2001).  One exception to the warrant requirement was recognized by the Supreme Court in 
Terry v. Ohio
, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), which held that a police officer who observes unusual conduct that leads him reasonably to conclude in light of his experience that criminal activity may be afoot may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions.  
Sorenson
, 196 Ill. 2d at 432.  
Terry
 also held that when an officer is justified in believing that the subject of such an investigation is armed and presently dangerous to the officer or others, the officer may conduct a pat-down search to determine if the person is in fact carrying a weapon; however, the only justification for such a search is to protect the officer or others, not to gather evidence.  
Sorenson
, 196 Ill. 2d at 432.  A protective search that goes beyond what is necessary to determine if a suspect is armed is no longer valid under 
Terry
, and its fruits will be suppressed.  
Sorenson
, 196 Ill. 2d at 432.

The trial court alternated between finding that Moon "had at least a reasonable suspicion that the backpack held by the Defendant contained contraband subject to seizure" and finding that the facts "created probable cause that the backpack held by the Defendant contained meth [
sic
] making materials and it was subject to seizure and the subsequent search."  However, we conclude that the facts fall well short of providing probable cause and that even the lesser standard of 
Terry
 provided no legitimate basis for Moon's seizure of defendant or the search of her backpack.  Moon testified that his office had received a call about a man leaving a backpack in the alley behind the house at 618 Poplar.  Moon saw a young girl in front of the house when he arrived.  He stated that there was nothing unusual about a young person carrying a backpack or using a cell phone.  Whether defendant was seized, as defendant argues, when Moon told her to come with him to the back of the house or, as the State argues, when Moon told her in the backyard that she could not leave, the evidence does not show that Moon had a reasonable belief, let alone probable cause to believe, that defendant was involved in any criminal activity.  Moon specifically stated that, at both of those points, he had no information to connect defendant to the backpack that was found in the alley.  However, in the backyard, he told defendant that he thought that she had materials for use in a methamphetamine lab and that she was not free to go.  At best, Moon thought that defendant, whom he had been told was a possible user of methamphetamine, had been untruthful with him; he heard what "sounded like glass jars inside" the backpack even though defendant told him that the pack contained only clothes; and loud music emanated from 618 Poplar after defendant told him that no one was home.  However, defendant subsequently told him that the pack also contained "personal items," and we are not told how
 
Moon distinguished between the sound of glass jars and the sounds made by bottles of high-end bottled water or bottles of nail polish and other cosmetics as they clink together.  In addition, Moon knew that when defendant knocked, Flickinger did not answer the door because she was taking a shower with her boyfriend.  This falls far short of even a reasonable belief that defendant was involved in criminal activity.

Even if Moon had a reasonable belief pursuant to 
Terry
, a search was not in order, as Moon never suspected that officer safety was at issue.  Moon testified that he never suspected that defendant had a weapon, and that defendant never acted aggressively toward him.  A 
Terry
 search is not a search for evidence; thus, if this were the only basis for the search, the fruits of the search would have to be suppressed.  See 
Sorenson
, 196 Ill. 2d at 432.

The trial court also found, and the State argues on appeal, that defendant consented to the search of her backpack.  It is clear from the record that defendant never gave oral or written consent to search her backpack; even when she opened her pack, she never said anything that would reasonably convey consent.  However, a defendant may convey consent to search with nonverbal conduct.  
People v. Anthony
, 198 Ill. 2d 194, 202 (2001).  The trial court's finding of consent in this case is based on subjective circumstantial evidence of nonverbal conduct rather than direct evidence of either oral or written consent.  We now review the ultimate conclusion of consent 
de novo
, based upon the totality of the circumstances.  See 
People v. Raibley
, 338 Ill. App. 3d 692, 698 (2003).

The totality of the circumstances in this case requires us to conclude that defendant did not consent to the search of her backpack.  Defendant's actions after Moon told her that he was going to get a search warrant were consistent with someone acting under duress and trying to avoid a search, not with someone giving consent to search.  Defendant opened the pack herself and pulled some clothing out; it was at that time that Moon first observed the jars inside defendant's pack.  However, by protesting that she had clothes in the backpack and showing that there was clothing within, defendant was implicitly attempting to 
avoid
 a search by selectively showing nonincriminating items.  The fact that Moon then could see into the backpack is not an indication that defendant was inviting him to search it.  Consent implies more than mere acquiescence.  
Anthony
, 198 Ill. 2d at 202.  In 
Anthony
, an officer requested consent to search the defendant's person for weapons; the defendant responded by spreading his legs apart and placing his hands on his head.  Our supreme court found this gesture to be ambiguous, susceptible to dueling inferences of consent and submission to a uniformed officer who had just asked him accusatory questions, in essence telling the officer to do what he had to do.  
Anthony
, 198 Ill. 2d at 203.  This, the court held, was not voluntary consent to search.

In the case before us, defendant did not even give an ambiguous gesture capable of being interpreted as acquiescence, let alone consent.  She "got irate" and affirmatively attempted to convince Moon 
not
 to look into the backpack by showing him that the backpack actually did contain clothing.  No dueling inferences arise from her actions.  Given the totality of the circumstances, defendant cannot be said to have given consent to search her backpack, and the trial court's finding of consent was erroneous.

Even if we were to conclude that defendant consented to a search of her backpack, we would conclude that the consent was involuntarily given. Consent is not valid unless it is voluntary, and, to be voluntary, consent must be given freely without duress or coercion (either express or implied).  
People v. LaPoint
, 353 Ill. App. 3d 328, 332 (2004).  Consent must be received, not extracted by implicit or explicit means or by implied threat or covert force.  
Anthony
, 198 Ill. 2d at 202.  The standard for such an inquiry is whether, in light of all the circumstances surrounding the officer's request for consent, a reasonable person in the defendant's position would have felt free to leave.  
LaPoint
, 353 Ill. App. 3d at 332.  If the answer is no, the defendant's consent is deemed involuntary and will not justify a search.  
LaPoint
, 353 Ill. App. 3d at 332.  The voluntariness of a consent is a question of fact determined from the totality of the circumstances, and the State bears the burden of proving that the consent was truly voluntary.  
Anthony
, 198 Ill. 2d at 202.

First and foremost, defendant opened her backpack only after she had been told that she could not leave; obviously, a reasonable person would not have felt free to leave.  In addition, she had already twice refused to give consent to search her pack.  After she was told that she could not leave, she was told that a search warrant was to be obtained to allow the search of the pack.  A finding that any consent given under those circumstances was voluntary is clearly improper.  An assertion by the police that they can definitively obtain a warrant is 
per se
 coercive.  
People v. Kratovil
, 351 Ill. App. 3d 1023, 1031 (2004).  If one is not free to leave and a warrant is to be obtained to allow a search, the search is a foregone conclusion, and a refusal to allow it is a futile act.  We cannot conclude that declining to continue a futile act is a voluntary decision to do the opposite.  Moon placed defendant in a situation where she had no real decision to make.  Defendant opened her bag in response to Moon's coercive threat to search, which in essence was an ultimatum of, "We can search you now or we can search you later."  Opening the backpack in response to a threat of a search instead of in response to a request to search does not make the ensuing search any less of a search or any more of a voluntary act.

Furthermore, as we have already seen, Moon had no probable cause to search defendant's pack.  Without probable cause, Moon could not obtain a warrant to search the pack.  Thus, Moon's false representation that he had the authority to seize the backpack and obtain a warrant to search it was coercive and illegal and vitiated the voluntariness of any consent thereby obtained.  See 
People v. Casazza
, 144 Ill. 2d 414, 424 (1991).

Considering the lack of actual consent, the lack of implied consent as evidenced by defendant's attempt to convince Moon that the backpack contained clothing, and the lack of voluntariness allowed by Moon's improper representations, we conclude that defendant did not give a valid consent to search her backpack.  Since there was no other valid basis to search the backpack, the evidence seized should have been suppressed, and the trial court erred in denying defendant's motion to suppress evidence.
  
Because defendant could not have been convicted without the evidence illegally obtained from her backpack, we reverse her conviction outright.  See 
People v. Holliday
, 318 Ill. App. 3d 106, 113 (2001).

For these reasons, the judgment of the circuit court of Carroll County is reversed.

Reversed.

BOWMAN and BYRNE, JJ., concur.