NOTICE
Decision filed 02/15/18. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2018 IL App (5th) 140223

NO. 5-14-0223

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Lawrence County. |
| | ) | |
| v. | ) | No. 11-CF-119 |
| | ) | |
| CHAD B. HAYES, | ) | Honorable |
| | ) | Mark L. Shaner, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CHAPMAN delivered the judgment of the court, with opinion.
Presiding Justice Barberis and Justice Goldenhersh concurred in the judgment and opinion.

**OPINION**

¶ 1    The event underlying this appeal is the tragic death of a seven-year-old boy. The defendant, Chad B. Hayes, struck the boy with his vehicle when the boy rode his bicycle in front of the defendant's vehicle. An officer investigating the accident requested that another officer drive the defendant to the hospital to provide blood and urine samples for drug testing. The test indicated the presence of drugs, and the defendant was charged with aggravated driving under the influence (DUI) (625 ILCS 5/11-501(d)(1)(F) (West 2010)). The defendant appeals his conviction on this charge, arguing that (1) he did not actually consent to the tests, (2) he did not impliedly consent to the tests under section 11-501.6(a) of the Illinois Vehicle Code (*id.* § 11-501.6(a)), (3) the test was not supported by probable cause or any exigent circumstances that

1

would justify failure to seek a warrant, (4) he was not proven guilty beyond a reasonable doubt, and (5) he did not knowingly waive his right to a jury trial. We reverse.

¶ 2 On July 25, 2011, the defendant was driving home from the store with two of his children. According to the defendant's statement to police, one of the children attempted to hand the defendant a piece of candy to unwrap for him. The defendant looked back to talk to the child. As he did, his vehicle struck seven-year-old David Kirby. The defendant did not see David beforehand. According to a statement given to police by Pamela Clem, who witnessed the accident, David rode his bicycle between two parked cars onto the roadway and into the path of the defendant's van. Clem did not believe that the defendant could have done anything to avoid the accident.

¶ 3 The accident took place near city hall in Sumner, Illinois. The defendant ran into city hall asking for help. Brent Parrott, a volunteer firefighter who was there that day, administered CPR to David. Several police officers responded to the accident, including Lawrence County Deputy Danny Ash, Illinois State Police Trooper Brooks Thomann, and Bridgeport Police Chief Scott Murray. Deputy Ash asked Chief Murray to transport the defendant to Lawrence County Memorial Hospital to provide blood and urine samples for drug screening. Chief Murray drove the defendant to the hospital. Deputy Ash arrived after the samples were taken and drove the defendant back to the police station. The results of initial tests performed by the hospital's lab were faxed to Deputy Ash later that afternoon. The tests revealed the presence of THC and amphetamine. After receiving these results, Deputy Ash placed the defendant under arrest for DUI.

¶ 4 The following day, July 26, 2011, Deputy Ash completed a police report. In it, he noted that testing of the samples by the hospital's lab indicated the presence of THC and amphetamine in the defendant's system, and he stated that "Chad Hayes was soon after placed under arrest." In

2

addition, Deputy Ash indicated that the defendant could be charged with endangering the health or life of a child (720 ILCS 5/12-21.6(a) (West 2010)), aggravated DUI (625 ILCS 5/11-501(d)(1)(F) (West 2010)), failure to exercise due care (*id.* § 11-1003.1), and failure to reduce speed to avoid an accident (*id.* § 11-601(a)).

¶ 5    At some point between July 25 and July 27, an assistant state's attorney discussed the matter with Deputy Ash. She told him that she was concerned about the fact that Chief Murray did not read the defendant the warning to motorists before the blood and urine samples were taken. See *id*. § 11-501.6(c). She also expressed concern about the fact that no traffic citation had been issued to the defendant. Due to these concerns, Deputy Ash asked the defendant to submit to a second drug test on July 27. The samples drawn on both dates were submitted to the Illinois State Police crime lab in Springfield. Testing of the blood drawn on July 25 indicated the presence of less than 50 ug/L of methamphetamine. The blood sample tested negative for any other substances. Testing of the urine sample collected on that date, however, indicated the presence of methamphetamine, amphetamine, THC, and naproxen. Both the blood and urine samples collected on July 27 tested negative for the presence of any drugs.

¶ 6    Deputy Ash also issued two traffic citations to the defendant for failing to exercise due care (*id.* § 11-1003.1) and failing to reduce speed to avoid an accident (*id.* § 11-601(a)). Both citations were dated July 27, 2011. On July 28, the defendant was charged with aggravated DUI (*id.* § 11-501(d)(1)(F)).

¶ 7    On July 23, 2012, the defendant filed a motion *in limine* seeking to exclude the results of the July 25, 2011, blood and urine tests. He filed amended motions on September 7 and September 11, 2012. He argued that (1) Deputy Ash lacked probable cause to require the defendant to submit to drug testing and (2) statutory requirements for the admission of test results were not satisfied. The matter came for a hearing on October 31, 2012.

3

¶ 8    The first witness to testify was Trooper Brooks Thomann of the Illinois State Police. He explained that the state police were asked to assist in the investigation because they have more experience and expertise than local police departments in handling crash investigations. Trooper Thomann noted that he is not an accident reconstruction specialist, and his involvement in the investigation was limited. He testified that upon arriving at the scene, he spoke with Deputy Ash, who advised him of the statement given to him by Pamela Clem describing the accident. Trooper Thomann took measurements at the scene of the accident, and determined that the defendant's vehicle dragged David Kirby on his bicycle 47 feet before coming to a stop. Trooper Thomann testified that he then proceeded to interview the defendant. The defendant told Trooper Thomann the same thing he told Deputy Ash. Trooper Thomann asked the defendant what speed he was driving, and the defendant indicated that he did not know. Trooper Thomann saw no indication that the defendant was speeding.

¶ 9    Trooper Thomann testified that he had both training and experience in recognizing the signs of intoxication or influence of drugs in motorists. He did not notice anything about the defendant's demeanor or appearance that would lead him to believe that the defendant was intoxicated or under the influence. He did not detect the odor of alcohol or drugs, and he noted that the defendant did not slur his speech. Asked what his conclusion was as to the cause of the accident, Trooper Thomann replied, "as far as I could see, the child had just ridden out into the street. And when he came around that vehicle, shot out in the middle of the street, and then Mr. Hayes struck him." Trooper Thomann testified that he did not issue any traffic citation to the defendant, explaining, "There was no violation, as far as Mr. Hayes."

¶ 10    The next witness to testify was Chief Scott Murray. Chief Murray did not actively participate in the investigation. He explained that because Sumner and Bridgeport have small police departments, the officers from the two departments help each other as needed. Chief

4

Murray indicated that he was the first officer to arrive at the scene. He directed traffic around the accident scene while Brent Parrott and the medics were attempting to administer CPR to the young child that was struck.

¶ 11　Chief Murray testified that Deputy Ash asked him to transport the defendant to Lawrence County Memorial Hospital for drug testing. Chief Murray did so. He testified that he did not know whether Deputy Ash had placed the defendant under arrest prior to this time. He further testified that during the 10-minute ride to the hospital, the defendant was not handcuffed. At the hospital, Chief Murray accompanied the defendant to the restroom while he provided a urine sample and remained with him while his blood was drawn. Chief Murray testified that he waited with the defendant until Deputy Ash arrived to transport him from the hospital. Chief Murray handed Deputy Ash the DUI kit completed by hospital staff and then left. He assumed that Deputy Ash transported the defendant back to the police station, but he left the hospital before they did.

¶ 12　Chief Murray acknowledged that he did not give the defendant the warning to motorists required by section 11-501.6(c) of the Illinois Vehicle Code (625 ILCS 5/11-501.6(c) (West 2010)).[1] He explained that the reason he did not do so was that it was not his investigation. He testified that he did not personally place the defendant under arrest at any time, and he did not issue the defendant any traffic citations.

¶ 13　The last witness to testify was Deputy Ash. He testified that he called for a tow truck "to have it on standby." He explained that the vehicle "would be stored until the investigation of the

---

[1] The statute provides that the warning "shall" be given. The officer is required to warn the motorist that if he refuses to submit to testing or if the tests indicate the presence of alcohol or illegal drugs, his license may be suspended. This case involves a prosecution for aggravated DUI, not the suspension of the defendant's license. 625 ILCS 5/11-501.6(c) (West 2010). In light of our conclusion that the testing violated the fourth amendment, we need not consider what, if any, impact Chief Murray's failure to provide the warning would have on the admissibility of the test results.

accident was complete." Deputy Ash testified that he then spoke with the defendant, who told him that when he looked back at a child who asked for help unwrapping a piece of candy, the little boy on the bicycle rode out in front of his vehicle.

¶ 14   Deputy Ash was then asked about his decision to have the defendant transported to the hospital for drug testing. Defense counsel asked him on what basis he made that decision. Deputy Ash responded, "He was involved in a personal injury accident. He was the driver of a vehicle involved in a personal injury accident." Deputy Ash then testified that "consent is implied whenever you receive a driver's license to obey all the rules in the [Illinois Vehicle Code]."

¶ 15   Deputy Ash acknowledged that providing a motorist with the warning to motorists prior to drug testing is standard operating procedure. See *id.* He further acknowledged that this procedure was not followed in this case.

¶ 16   Deputy Ash testified about the timing of the defendant's arrest for DUI and the issuance of the two traffic citations. He noted that he believed the statute governing implied consent to drug testing required only the issuance of a traffic citation, rather than an arrest. He conceded that the defendant was not under arrest at the time he was transported to the hospital for testing, testifying that he arrested the defendant on the charge only after receiving the initial test results from the hospital's lab.

¶ 17   Defense counsel asked Deputy Ash whether he had *issued* traffic citations to the defendant prior to directing him to be taken to the hospital for drug testing. In response, Deputy Ash stated that the defendant had not been *handed* a citation prior to this point. He acknowledged that he did not give the citations to the defendant until July 27, two days after the initial tests, but he testified that the citations were written earlier. He testified that he wrote them at some point while he was filling out all the paperwork relevant to the investigation. Deputy

6

Ash acknowledged that his police report, a component of this "paperwork," was dated July 26, 2011. He stated, "I couldn't really tell you exactly the order all that paperwork was completed."

¶ 18     The following exchange then took place between defense counsel and Deputy Ash:

"Q. What date *** did you write the tickets?

A. The tickets would have been written on the day of this report when all this other stuff was done.

Q. Are you sure they weren't written on July 26?

A. Yeah, I'm sure. He was—this was the date he was held on these charges, and they are all listed on the back of the report."

At this point the court interrupted and asked, "So what date—what date are you saying they were written?" Deputy Ash replied, "The 25th." He acknowledged, however, that the date appearing on both citations was July 27. Later, on cross-examination, Deputy Ash admitted that he issued the tickets on that date, stating, "I was wrong in the date of the 25th."

¶ 19     Asked to explain why he took the unusual step of ordering a second drug test, Deputy Ash explained that someone from the state's attorney's office informed him that the initial test might not be valid because the defendant was not given the warning to motorists and because he was not given any traffic citations prior to the tests. He testified that the second test was intended to remedy this flaw. Deputy Ash first testified that both tests indicated the presence of drugs. After looking at the reports from the police crime lab, however, he admitted that the second test came back negative for the presence of drugs.

¶ 20     Finally, on cross-examination, Deputy Ash testified that he was familiar with the defendant due to the defendant's prior contact with other officers and other police departments. He noted that the defendant had some marijuana and methamphetamine offenses, as well as

7

traffic offenses, a DUI conviction, driving with his license suspended, "and things like that." The presentence investigation report prepared in this case indicates that in Lawrence County, the defendant had three prior charges for possession of marijuana and two prior charges for possession of drug paraphernalia between 2005 and 2011, a 2010 traffic citation for driving with an expired registration, and a 2000 citation for operating an uninsured vehicle. The report also showed four Wabash County charges for driving with a revoked or suspended license, all of which occurred between November 2000 and October 2001, and a 2000 charge for possession of drug paraphernalia. The report did not include any prior DUI charges.

¶ 21    The parties submitted written arguments to the court after the hearing. On August 27, 2013, the court announced its ruling from the bench, denying the defendant's motions to exclude the evidence. The court first made express findings of fact. It found that none of the investigating officers noticed anything unusual about the defendant's demeanor, but that Deputy Ash was aware that the defendant had prior drug offenses "as well as a DUI." The court further found that Deputy Ash believed that the Illinois Vehicle Code authorized the drug testing of any driver involved in an injury accident. The court also found that the defendant was not under arrest at the time he was transported to the hospital for testing. The court found that there was no evidence that the defendant either objected to the testing or gave verbal consent to the testing. However, the court concluded that the testing was consensual. In explaining its rationale, the court noted that the defendant was on probation at the time and was subject to random drug testing as a condition of probation. The court stated, "I think the defendant, knowing he was on probation and subject to random testing, consented to the blood and urine draw." Because the court found the test to be consensual, it did not address the parties' arguments concerning probable cause, exigent circumstances, or implied consent.

8

¶ 22    The defendant filed a motion to reconsider this ruling, arguing that no evidence was presented that the defendant was even asked to consent to the test. In response, the State argued that consent need not be verbal. The State also urged the court to consider the alternative grounds for denying the defendant's motion which the court did not previously address.

¶ 23    On January 28, 2014, the court entered a written order ruling on the defendant's motion to reconsider. The court reversed its finding regarding consent, explaining that "the State failed to prove the defendant did anything more than merely or silently acquiesce." However, the court found that the tests were supported by probable cause. It reasoned that Deputy Ash's knowledge that the defendant had a history of drug charges and a prior DUI coupled with the defendant's admitted lack of attention to the road gave Deputy Ash probable cause to believe the defendant may have been under the influence of drugs.

¶ 24    On February 13, 2014, the defendant filed another motion to reconsider, calling to the court's attention the fact that the presentence investigation showed that the defendant did not have any prior DUI charges and that Pamela Clem's statement to police showed that the defendant was not driving erratically at the time the accident occurred. At a hearing, the State argued that the body of the young child was sufficient to show probable cause. The court found probable cause to support the tests. In explaining its ruling, the court noted that Deputy Ash might reasonably have decided that he did not believe the defendant's version of events and that Deputy Ash might reasonably have concluded that the presence of drugs may have been a contributing factor to the defendant's inattentiveness.

¶ 25    On February 27, 2014, the matter proceeded to a stipulated bench trial, at which the court found the defendant guilty. The defendant subsequently filed a motion for a new trial, which the court denied. The court sentenced the defendant to 54 months in prison. This appeal followed.

¶ 26    The question before us is whether the results of the drug tests performed on July 25 should have been excluded because they were obtained in violation of the fourth amendment to the United States Constitution. The fourth amendment guarantees the right to be free from "unreasonable searches and seizures." U.S. Const., amend. IV. The Illinois Constitution provides this same protection. *People v. Kratovil*, 351 Ill. App. 3d 1023, 1030 (2004) (citing Ill. Const. 1970, art. I, § 6). The compulsory testing of a defendant's blood or other bodily fluids is a search within the meaning of the fourth amendment. *Missouri v. McNeely*, 569 U.S. 141, 148 (2013); *Schmerber v. California*, 384 U.S. 757, 767 (1966). Indeed, it is a particularly intrusive type of search. *McNeely*, 569 U.S. at 148 (explaining that "[s]uch an invasion of bodily integrity implicates an individual's 'most personal and deep-rooted expectations of privacy' " (quoting *Winston v. Lee*, 470 U.S. 753, 760 (1985))).

¶ 27    To be reasonable under the fourth amendment, a search must ordinarily be conducted pursuant to a warrant supported by probable cause. There are, however, "a few specifically established and well-delineated exceptions" to the requirement of a warrant. *Katz v. United States*, 389 U.S. 347, 357 (1967). Two of these recognized exceptions were addressed by the trial court in this case. Under one exception, a warrantless search is reasonable—and therefore permissible—if exigent circumstances exist that create a compelling need for officers to conduct the search before there is time to obtain a warrant. *McNeely*, 569 U.S. at 148-49. The existence of such exigent circumstances must be determined on a case-by-case basis in light of the totality of circumstances. *Id.* at 149. In DUI cases, the natural dissipation of alcohol or other substances in the blood stream often supports a finding of exigent circumstances. *Id.* at 156. However, the United States Supreme Court held in *McNeely* that this does not create a *per se* exigency applicable in all DUI cases. *Id.* at 144. A warrantless search based on exigent circumstances must also be supported by probable cause. *People v. Ferral*, 397 Ill. App. 3d 697, 706 (2009).

¶ 28    Another recognized exception to the warrant requirement is voluntary consent to a search. *People v. Anthony*, 198 Ill. 2d 194, 202 (2001); *Kratovil*, 351 Ill. App. 3d at 1030. Consent to a search is the waiver of a constitutional right. *Kratovil*, 351 Ill. App. 3d at 1030. The validity of a warrantless search based on consent thus "depends on the voluntariness of the consent." *Anthony*, 198 Ill. 2d at 202. Whether consent is voluntary is a question of fact that must be determined by evaluating the totality of the circumstances. The State has the burden of proving that the defendant's consent to the search "was truly voluntary." *Id.*

¶ 29    In reviewing a trial court's ruling on a motion to suppress evidence, we will not reverse the trial court's findings of historical fact unless those findings are against the manifest weight of the evidence. *Kratovil*, 351 Ill. App. 3d at 1029-30. However, "we review *de novo* the ultimate question of whether the evidence should be suppressed." *Id.* at 1030.

¶ 30    Here, the court found that the defendant did not consent to the blood and urine tests. However, the court found that the tests were justified by the existence of exigent circumstances plus probable cause. On appeal, the State does not argue that Deputy Ash had probable cause to order the tests. Instead, the State asks us to affirm the trial court's ruling on the alternative basis that the ordering the tests without a warrant was reasonable because of the defendant's actual or implied consent. See *People v. Ringland*, 2015 IL App (3d) 130523, ¶ 33 (noting that an appellate court may affirm a trial court's ruling on any basis appearing in the record, even if it was not the basis relied upon by the trial court, and even if the trial court's reasoning was not correct).

¶ 31    The defendant correctly notes that arguments not asserted in a party's appellate brief are forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016). He thus urges us to find that the State has conceded the point. See *In re Deborah S.*, 2015 IL App (1st) 123596, ¶ 27 (finding the failure of an appellee to respond to an appellant's arguments on an issue tantamount to a concession). We

11

agree. We also agree that the July 25 test was not supported by probable cause. Probable cause to conduct a search exists when the facts and circumstances known to the officer prior to the search are such that the officer could reasonably believe that the search will likely yield evidence of a crime. *People v. Lukach*, 263 Ill. App. 3d 318, 323 (1994). Here, the court's finding of probable cause was based on the court's belief that it *would be reasonable* for Deputy Ash to disbelieve the version of events given by the defendant, but Deputy Ash never testified that this was the case. In addition, the court found that it *would be reasonable* for Deputy Ash to conclude that the presence of drugs might have contributed to inattention on the part of the defendant. However, this reasoning is bootstrapping, and Deputy Ash never testified that he in fact reached that conclusion.

¶ 32    We note that because Deputy Ash did not have probable cause to test the defendant for drugs, we need not consider whether exigent circumstances were present under *McNeely*. We conclude that the court erred in finding the tests to be justified on the basis of the exigent-circumstances-plus-probable-cause exception. We turn our attention to the question of consent.

¶ 33    We first consider whether the testing was supported by the defendant's actual consent. As noted earlier, the validity of the search depends on whether the defendant's consent was truly voluntary. *Anthony*, 198 Ill. 2d at 202. Acquiescence to apparent authority is not the same thing as consent. *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968); *Anthony*, 198 Ill. 2d at 202. Consent to a search "must be received, not extracted." *Anthony*, 198 Ill. 2d at 202 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)).

¶ 34    A defendant can consent to a search without making an express verbal statement of consent; he can instead convey his consent to officers through nonverbal conduct. *Id.* However, " 'there is little authority as to what constitutes consent in the absence of an express verbal statement.' " *Id.* (quoting *People v. Henderson*, 142 Ill. 2d 258, 298 (1990)). As the Illinois

12

Supreme Court observed in *Anthony*, "dueling inferences [can] easily arise from a single ambiguous gesture." *Id.* at 203. As we explained earlier, consent to a search is the waiver of a constitutional right. *Kratovil*, 351 Ill. App. 3d at 1030. As such, a "defendant's intention to surrender this valuable constitutional right should be unmistakably clear." *Anthony*, 198 Ill. 2d at 203.

¶ 35    Moreover, even unmistakably clear consent is not valid unless it is given voluntarily. *People v. Green*, 358 Ill. App. 3d 456, 462 (2005). Consent is voluntary when it is "given freely without duress or coercion." *Id.* (citing *People v. LaPoint*, 353 Ill. App. 3d 328, 332 (2004)). In determining whether this standard is met, courts consider "whether, in light of all the circumstances surrounding the officer's request for consent, a reasonable person in the defendant's position would have felt free to leave" or to refuse to consent to the search. *Id.* at 463 (citing *LaPoint*, 353 Ill. App. 3d at 332).

¶ 36    Courts have found requests for consent to search to be coercive under many different sets of circumstances. In some cases, courts have found that consent was not voluntary because police falsely represented that they had authority to conduct the search with or without consent. In *Bumper v. North Carolina*, for example, police officers informed the defendant's grandmother that they had a warrant to search her home even though they did not have a warrant. She believed the officers and told them to " 'Go ahead' " and search the house. Their search led to evidence against the defendant. *Bumper*, 391 U.S. at 546. The United States Supreme Court held that her consent to the search was not valid under these circumstances. *Id.* at 548. The Court explained that by telling the defendant's grandmother that they had a warrant, the officers in effect told her that she had "no right to resist the search." *Id.* at 550. The Court found that their deception amounted to "coercion—albeit colorably lawful coercion." *Id.*

13

¶ 37    In other cases, courts have found consent not to be voluntary because intimidating or coercive conduct on the part of police led defendants to feel that they had no choice but to consent to the search. In *Anthony*, for example, the Illinois Supreme Court found an officer's request for consent to search the defendant's person to be coercive due to "the intimidating presence of an armed and uniformed police officer who had just asked a series of subtly and increasingly accusatory questions." *Anthony*, 198 Ill. 2d at 203. Similarly, in *Green*, the appellate court found that the defendant did not voluntarily consent to a search of her backpack after a police officer explicitly told her that she was not free to leave. *Green*, 358 Ill. App. 3d at 463. The *Green* court found further support for its conclusion from the fact that the officer falsely told her that he could obtain a warrant to search the backpack. *Id.*

¶ 38    Although these cases are illustrative of the type of police conduct that might render a defendant's consent to a search involuntary, every case must be evaluated in light of the totality of its own circumstances. See *Anthony*, 198 Ill. 2d at 202; *Green*, 358 Ill. App. 3d at 463; *Kratovil*, 351 Ill. App. 3d at 1030. With these principles in mind, we turn to the circumstances surrounding the search that took place in this case.

¶ 39    The defendant argues that the trial court correctly determined that there was no evidence that he consented to the search and no evidence that he was even *asked* to consent. He argues that he cannot be deemed to have consented merely because he got into the vehicle with Chief Murray. The State argues that the defendant unambiguously consented to the search through his conduct by getting into the vehicle. The State further argues that his consent was voluntary because there was no evidence that he objected to the request that he submit to the test. The State contends that the instant case is distinguishable from *Bumper*, *Anthony*, and *Green* because there is no evidence that any officer explicitly told him he could not lawfully refuse to take the test, as

14

occurred in *Bumper* and *Green*, nor was there any evidence that the officers were as confrontational as the officers in *Anthony* and *Green*. We agree with the defendant.

¶ 40    Here, the record contains no evidence at all concerning how the test was presented to the defendant or how the defendant responded. We do not know whether Deputy Ash asked the defendant to take the test or demanded that he do so. We do not know whether Deputy Ash told the defendant that he had no right to refuse the test. We do not know whether the defendant agreed to take the test, objected, or merely acquiesced. The State asks us to presume based on this record that the defendant deliberately got into Chief Murray's vehicle because he willingly agreed to submit to a test he felt free to refuse. We cannot find the waiver of an important constitutional right based on these circumstances.

¶ 41    Moreover, even assuming the defendant did anything to unambiguously convey consent, the surrounding circumstances indicate that any such consent was not voluntary. He was transported to the hospital for the test by a uniformed police officer. The officer remained with him at all times, even when he went to the restroom to provide a urine sample. Deputy Ash had the defendant's vehicle towed from the scene of the accident to be stored until Deputy Ash completed his investigation. We do not believe that a reasonable person confronted with these circumstances would feel free to leave the hospital or refuse to take the test. See *Green*, 358 Ill. App. 3d at 463. We note that the State essentially concedes that the defendant was not free to leave in support of its claim that he was under arrest for purposes of triggering the implied consent provision (625 ILCS 5/11-501.6(a) (West 2010)), as we will discuss next. Considering the totality of these circumstances, we find that the State failed to meet its burden of demonstrating that the defendant voluntarily consented to the tests. See *Anthony*, 198 Ill. 2d at 202.

15

¶ 42    Finally, we consider the parties' arguments concerning implied consent. Section 11-501.6(a) of the Illinois Vehicle Code provides that any motorist "shall be deemed to have given consent" to drug testing if the motorist is "arrested as evidenced by the issuance of a Uniform Traffic Ticket for any violation of the Illinois Vehicle Code *** with the exception of equipment violations." 625 ILCS 5/11-501.6(a) (West 2010). The statute, by its express terms, applies only if the defendant has been arrested for a violation of the Illinois Vehicle Code when asked to submit to testing. We agree with the defendant that this condition was not met in this case.

¶ 43    There is no dispute in this case that Deputy Ash did not issue any traffic citations to the defendant until two days after he directed the defendant to submit to the test. The State argues, however, that although traffic citations are evidence of an arrest, they are not the only such evidence, and a citation is not a prerequisite to an arrest for a violation of the Illinois Vehicle Code. As such, the State contends, the implied consent provision is applicable if an officer arrests a defendant for a violation of the Illinois Vehicle Code before requesting that a motorist submit to drug testing even if the officer does not issue a citation until later. The State further argues that the defendant was under arrest before submitting to the drug tests because a reasonable person in his position would not have felt free to leave. This is the definition of an arrest for purposes of triggering the fourth amendment's protections against unreasonable seizures. See *People v. Lopez*, 229 Ill. 2d 322, 346 (2008). The State thus asks us to find that the defendant was under arrest for a violation of the Illinois Vehicle Code when he was transported to the hospital for testing.

¶ 44    In support of its position, the State cites *People v. Gamblin*, 251 Ill. App. 3d 769 (1993), *People v. Brantley*, 248 Ill. App. 3d 580 (1993), and *People v. Wozniak*, 199 Ill. App. 3d 1088 (1990). We note that all three of these cases arise under a different statute than the one at issue here—section 11-501.1 of the Illinois Vehicle Code. See *Gamblin*, 251 Ill. App. 3d at 769;

16

*Brantley*, 248 Ill. App. 3d at 581; *Wozniak*, 199 Ill. App. 3d at 1089. The two statutes apply under different, but overlapping, sets of circumstances. Section 11-501.1 only applies to motorists who have been arrested for DUI, whether or not they were involved in an injury accident, while the statute at issue in this case applies to motorists who have been arrested for any violation of the Illinois Vehicle Code but only if they have been involved in an accident involving a fatality or serious injury. However, the statutes contain implied consent provisions that are otherwise identical in all relevant respects. See 625 ILCS 5/11-501.1(a) (West 1992). Thus, the courts' interpretations of section 11-501.1(a) are pertinent here.

¶ 45    In *Gamblin*, the defendant was arrested for DUI and four other traffic violations. Police officers administered field sobriety tests and asked her to submit to a Breathalyzer test, which she refused to do. *Gamblin*, 251 Ill. App. 3d at 770. One officer then read the defendant her *Miranda* warnings while the other officer prepared tickets for the violations. The defendant's driver's license was summarily suspended due to her refusal to take the Breathalyzer test. *Id.*; see 625 ILCS 5/11-501.1(d) (West 1992).

¶ 46    The defendant filed a motion to quash her arrest and rescind the suspension of her license. She argued that the pertinent statute did not apply because the issuance of a citation was a prerequisite to a valid arrest for DUI. *Gamblin*, 251 Ill. App. 3d at 770. The trial court agreed with this reasoning and rescinded the summary suspension, but the Second District reversed that decision.

¶ 47    In reaching this conclusion, the court explained that the relevant inquiry for application of the implied consent provision was "not whether or when a citation was issued, but whether and when a defendant was arrested for DUI." *Id.* at 771. The court noted that while a citation "is one manner of evidencing an arrest," it is not the only manner of showing that a defendant has been arrested. *Id.* The defendant in that case underwent field sobriety tests and received tickets for

17

multiple offenses. She was told that she was under arrest and was transported to the police station. The court found that all of these things were evidence that she was under arrest for DUI. *Id.* The court held that "[t]he standard for determining if and when an arrest has occurred is whether, under those circumstances and innocent of any crime, a reasonable person would have felt restrained from leaving." *Id.*

¶ 48    *Brantley* was a consolidated appeal involving the summary suspension of three defendants' licenses under circumstances similar to those involved in *Gamblin*. There, each of the defendants was arrested for DUI during a traffic stop, taken into custody, and then asked to submit to a breath test. *Brantley*, 248 Ill. App. 3d at 581. Each defendant either refused to take the test or failed the test. In each of the three cases, the officer issued a citation for DUI after the defendant refused or failed the breath tests. *Id.* at 582. The *Brantley* court employed similar reasoning to the *Gamblin* court. It concluded that as long as there is sufficient evidence that the defendant has been arrested for DUI prior to being asked to submit to the test, the implied consent provision applies even if no citation is issued until after the test. *Id.* at 582-84.

¶ 49    Unlike *Gamblin* and *Brantley*, the issue in *Wozniak* was the admissibility of a breath test in a criminal prosecution for DUI. *Wozniak*, 199 Ill. App. 3d at 1089. There, the defendant was involved in an accident with another vehicle. After issuing a citation to the other driver for failure to yield the right of way, the investigating officer noticed that the defendant was staggering and having difficulty speaking and that his breath smelled of alcohol. *Id.* The officer administered field sobriety tests, which the defendant failed. The officer then transported the defendant to the police station for a breath test, which the defendant also failed. The officer only then issued a citation for DUI. *Id.*

¶ 50    The defendant's license was summarily suspended. However, the defendant filed a petition to rescind the summary suspension, arguing that he was not properly arrested before

18

being asked to take the breath test because the ticket had not yet been issued. *Id.* The trial court agreed and granted his motion to rescind. *Id.* The defendant later filed a motion to suppress the results of the breath test in a criminal prosecution for DUI, raising the same argument. *Id.* at 1089-90. The trial court granted the motion, and the State appealed that ruling. *Id.* at 1090.

¶ 51    On appeal, the State did not argue that the defendant was arrested for DUI prior to submitting to the breath test even though the ticket was issued later. In fact, the State assumed that, in a proceeding involving the summary suspension of the defendant's license, the timing of the ticket would not be relevant. *Id.* The State argued only that for purposes of a DUI prosecution, test results are admissible as long as the test was supported by probable cause, regardless of when the defendant was arrested or issued a ticket. *Id.*

¶ 52    The Third District agreed. It held that the protections found in the applicable statute, which governed summary suspension, were not applicable in DUI prosecutions—including the requirement that a motorist be arrested for DUI prior to being deemed to have consented to testing. *Id.* at 1091. Significantly, the court also held that in criminal cases, the "admissibility of blood-alcohol test results is subject to fourth amendment constraints." *Id.*

¶ 53    In *dicta*, the court went on to note that it disagreed with the trial court's conclusion that the defendant was not under arrest before submitting to breath test. *Id.* at 1092. Like the courts in *Gamblin* and *Brantley*, the *Wozniak* court based this conclusion on its determination that a reasonable person in the defendant's position would not have felt free to leave. *Id.*

¶ 54    The State argues that these three cases support its position for two reasons. First and foremost, the State argues that under all three cases, once the defendant's circumstances were such that a reasonable person in his position would not have felt free to leave, he was under arrest, and it did not matter that the citations were issued two days later. In arguing that a reasonable person in the defendant's position would not have felt free to leave, the State points to

the same circumstances that led us to conclude earlier that the defendant did not voluntarily consent to the tests—he was transported to the hospital by a uniformed police officer who remained with him at all times, even while he was in the restroom providing a urine sample, and he was transported back to the police station by another officer. As we have already discussed, this is the test for when an individual is under arrest or "seized" within the meaning of the fourth amendment. See *Lopez*, 229 Ill. 2d at 346. We agree that this test was satisfied. We nevertheless find the State's argument unpersuasive.

¶ 55    One flaw in the State's argument is that being "under arrest" for purposes of triggering the fourth amendment's protections against unreasonable seizures is not necessarily the same thing as being under arrest *for* a specific offense. As we have discussed, the defendants in all three cases were administered field sobriety tests and taken into custody before being asked to submit to further testing. The officers in all three cases testified that they placed the defendants under arrest *for DUI* prior to administering the breath tests. Here, by contrast, Deputy Ash admitted that he did not arrest the defendant for DUI until after he received the initial test results from the hospital's lab, and there is nothing in the record to indicate that he arrested the defendant for any other violation of the Illinois Vehicle Code prior to that time either. Although Deputy Ash testified that he wrote the citations at some unspecified time before he gave them to the defendant, both tickets were dated July 27. That was two days after he sent the defendant for testing, and it was after he learned from the state's attorney's office that the test results might not be admissible because he did not issue any citations. The defendant was seized within the meaning of the fourth amendment when he submitted to the tests, but he was not under arrest for a violation of the Illinois Vehicle Code as required by the implied consent provision.

¶ 56    Second, the State points to language in *Wozniak* where the court explained that it found "no expression of legislative intent to extend the predicate arrest provision of the summary

20

suspension statute to DUI prosecutions." *Wozniak*, 199 Ill. App. 3d at 1091. The State argues that the same rationale should apply to the provision at issue here. We are not persuaded. The *Wozniak* court reached this conclusion after noting that there are "substantive differences between *civil implied consent proceedings* [involving statutory summary suspension] and a criminal DUI prosecution." (Emphasis added.) *Id.* Moreover, as we emphasized earlier, the court also held that the admission of test results in a criminal case "is subject to fourth amendment constraints." *Id.* Thus, we do not read *Wozniak* as holding that the implied consent provision applies in DUI cases but is not subject to the same limitation applicable in civil summary suspension cases. Instead, we read it as holding that if a test is otherwise proper under the fourth amendment, its results are admissible regardless of whether the requirements for application of the implied consent provision are satisfied.

¶ 57    Accepting the State's arguments in this case would mean that almost any driver involved in an accident involving a fatality or serious injury would be deemed to have consented to drug screening. If an officer restricts the driver's freedom in any meaningful way, the driver would be deemed to have consented to the test through the implied consent provision—even if his movement is only so restricted because of the officer's decision to administer the test, as happened in this case. If the officer does not restrict the driver's freedom to the extent necessary to constitute a seizure or arrest within the meaning of the fourth amendment, the driver will, in many cases, be deemed to have voluntarily consented. Given the particularly intrusive nature of the blood testing at issue in this case, such a result would be untenable. We therefore hold that before a motorist may be found to have impliedly consented to this intrusive search, thereby waiving an important constitutional right, he must be under arrest *for* a violation of the Illinois Vehicle Code. The fact that the defendant's movement is restricted to the degree necessary to be

21

seized within the meaning of the fourth amendment coupled with a decision to issue tickets one to two days after the fact, as occurred in this case, is not sufficient to meet this standard.

¶ 58 We note that our holding does not limit the admissibility of test results in cases where the defendant has actually given voluntary consent or in cases where some other recognized exception to the requirement of a warrant applies. We merely hold that the State cannot rely on the implied consent provision unless the defendant has been arrested for a nonequipment violation of the Illinois Vehicle Code. Our holding limits application of the provision to those situations in which an officer has determined that a defendant has committed an infraction serious enough to warrant an arrest. To find that standard met in this case would allow the State to do an end-run around the requirements of the fourth amendment.

¶ 59 We conclude that the drug test at issue in this case did not fall within any recognized exception to the requirement of a warrant. As such, it was an unreasonable search within the meaning of the fourth amendment, and the results should have been excluded. Because there is insufficient evidence to convict the defendant without evidence of the test results, we will reverse his conviction outright. See *Green*, 358 Ill. App. 3d at 464. In light of this conclusion, we need not address the defendant's arguments concerning the sufficiency of the evidence that was admitted or the waiver of his right to a jury trial.

¶ 60 For the foregoing reasons, we reverse the defendant's conviction.


¶ 61 Reversed.

2018 IL App (5th) 140223

NO. 5-14-0223

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS,　　　)　　Appeal from the
　　　　　　　　　　　　　　　　　　　　　　)　　Circuit Court of
　　　　Plaintiff-Appellee,　　　　　　　　　)　　Lawrence County.
　　　　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　　　　)　　No. 11-CF-119
　　　　　　　　　　　　　　　　　　　　　　)
CHAD B. HAYES,　　　　　　　　　　　　　　)　　Honorable
　　　　　　　　　　　　　　　　　　　　　　)　　Mark L. Shaner,
　　　　Defendant-Appellant.　　　　　　　　　)　　Judge, presiding.

_____

**Opinion Filed:**　　　　　　February 15, 2018

_____

**Justices:**　　　　Honorable Melissa A. Chapman, J.

　　　　　　　　　Honorable John B. Barberis, P.J., and
　　　　　　　　　Honorable Richard P. Goldenhersh, J.,
　　　　　　　　　Concur

_____

**Attorneys**　　　Michael J. Pelletier, State Appellate Defender, Ellen J. Curry, Deputy
**for**　　　　　　Defender, Jennifer M. Lassy, Assistant Appellate Defender, Office of
**Appellant**　　　the State Appellate Defender, Fifth Judicial District, 909 Water Tower
　　　　　　　　　Circle, Mt. Vernon, IL 62864

_____

**Attorneys**　　　Hon. Michael L. Strange, State's Attorney, Lawrence County
**for**　　　　　　Courthouse, Lawrenceville, IL 62439; Patrick Delfino, Director,
**Appellee**　　　David J. Robinson, Deputy Director, David Mannchen, Staff Attorney,
　　　　　　　　　Office of the State's Attorneys Appellate Prosecutor, 725 South Second
　　　　　　　　　Street, Springfield IL 62704

_____